STATE of Tennessee

v.

**Paul Dennis REID, Jr.**

Supreme Court of Tennessee, at Nashville.

Oct. 6, 2006 Session.

Dec. 27, 2006.

Rehearing Denied Jan. 17, 2007.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michelle Chapman McIntire, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kathy Morante, Tom Thurman, Roger Moore, Grady Moore, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined. ADOLPHO A. BIRCH, JR., SP. J., concurred in part and dissented in part.

The defendant, Paul Dennis Reid, Jr., was convicted of three counts of premeditated murder, three counts of felony murder, one count of attempted murder, and one count of especially aggravated robbery. The trial court merged each of the felony murder convictions with the corresponding premeditated murder convictions. The jury sentenced the defendant to death based upon four aggravating circumstances, *see* Tenn.Code Ann. § 39–13–204(i)(2), (6), (7), (12) (Supp.1996), and further found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, *see* Tenn.Code Ann. § 39–13–204(g)(1) (Supp. 1996). We hold that (1) the trial court did not err by finding the defendant competent to stand trial; (2) the trial court did not err by admitting the testimony of the defendant's former employer; (3) the trial court did not err by denying the motion to limit proof regarding the defendant's financial condition; (4) the trial court did not err by refusing to recuse itself from the case; (5) the trial court did not err by allowing the State to introduce evidence of the murders at the Captain D's restaurant to establish the "mass murder" aggravating circumstance; and (6) the defendant's sentences of death are not invalid under the mandatory review criteria of Tennessee Code Annotated section 39–13–206(c)(1). As to the remaining issues, we agree with the conclusions reached by the Court of Criminal Appeals. The relevant portions of its opinion are appended. The

judgment of the Court of Criminal Appeals is, therefore, affirmed.

The defendant, Paul Dennis Reid, Jr., was indicted for three counts of premeditated murder, three counts of felony murder during the perpetration of a robbery, one count of attempted first degree murder, and one count of especially aggravated robbery.

### Guilt Phase of Trial

On March 23, 1997, Ronald Santiago, Andrea Brown, Robert Sewell, and Jose Ramirez Gonzales, employees of a McDonald's restaurant on Donelson Pike in Davidson County, Tennessee, had just completed their night shift when the defendant forced his way into the restaurant, ordered them into the office, and demanded money. After Santiago, the manager, handed over the contents of the restaurant safe, the defendant directed the employees into a storage area and ordered them to lie on the floor. He then fired two shots each into the heads of Brown, Santiago, and Sewell. When the defendant attempted to shoot Gonzales, however, the gun malfunctioned. Gonzales struggled and the defendant drew a knife and stabbed him repeatedly. Gonzales stopped fighting, feigned death, and when the defendant left, was able to telephone for help. Santiago and Sewell died at the scene. Brown died later at the hospital.

At trial, Gonzales testified that on the night of the shooting he and Robert Sewell were leaving the restaurant when they were confronted by a man armed with a small, silver handgun and carrying a bag under his arm. Gonzales recalled that the man, whom he later identified as the defendant, said something in English. Santiago, who was in the doorway of the restaurant and overheard the comment, translated into Spanish, informing Gonzales that the defendant had ordered them

back into the restaurant. When the three men returned to the restaurant, the defendant demanded the money from the safe and placed the contents into his bag. Gonzales recalled that the defendant then directed the employees into a storage area where he shot Sewell, Santiago, and Brown execution-style. The defendant then attempted to shoot Gonzales, but the gun malfunctioned. Gonzales fought the defendant but was overpowered and stabbed in the stomach. As Gonzales fell to the floor, the defendant stabbed and kicked him repeatedly. The defendant discontinued the attack only when Gonzales pretended to be dead. Although badly injured, Gonzales was able to telephone 911 after the defendant left. The police arrived minutes later and Gonzales was taken to the hospital by ambulance.

Dorothy Carter, the dispatcher who answered the 911 call, testified that she could hear only groans and mumbling. Although she was unable to communicate with the caller, she nevertheless dispatched both the police and an ambulance to the restaurant.

Detective Mike Rolland, who investigated, found no fingerprints, shoe prints, or other physical evidence linking the defendant to the crime scene. He and other officers found six Remington .25 caliber automatic cartridge casings inside the restaurant. Testing established that the casings matched the .25 caliber bullets recovered from the three murder victims.

Detective Pat Postiglione testified that Gonzales worked with a police sketch artist in an effort to develop a composite drawing of the suspect. Gonzales had described the mustached perpetrator as twenty-nine to thirty years old, tall, thin, and possibly of Hispanic descent, with long hair only partially covered by his baseball cap. Detective Postiglione confirmed that during the investigation, Gonzales viewed

more than three hundred photographs of potential suspects, eventually identifying the defendant some four months after the shootings.

Other testimony established that prior to the crimes the defendant had moved from Texas to Nashville to pursue a career in country music. He obtained employment at a Shoney's restaurant, where Mitchell Roberts served as manager. Roberts testified that the defendant worked at the Shoney's until February of 1997, only weeks before the shootings. He stated that he next saw the defendant in June of 1997 when the defendant unexpectedly arrived at his residence. Roberts recalled that the defendant had in his possession a small caliber automatic handgun and a knife that was approximately eight to nine inches long.

Danny Tackett, a former co-worker of the defendant, testified that in January 1997, he overheard the defendant, who was experiencing financial difficulties, speak of robbing a fast food restaurant at night, when there would be no witnesses. Tackett recalled that the defendant asked him for help in procuring a gun. The defendant made similar comments to another former co-worker, Jeffrey Potter, and explained that robbery was an easy way to make money. Potter testified that the defendant had also solicited his assistance in an effort to acquire a gun.

The proof established that approximately eight to ten weeks before the crimes, Robert Bolin sold the defendant two .25 caliber automatic handguns. One was nickel-plated with black handle grips and the other was nickel-plated with pink handles. Bolin testified that he gave the defendant a box of ammunition in a green and yellow box as a part of the transaction.

Agent Tommy Heflin of the Tennessee Bureau of Investigation, who was familiar with ammunition for handguns, testified that the bullets recovered from the bodies of the victims were Remington brand. Agent Heflin confirmed that Remington ammunition was packaged in a green and yellow box.

## Sentencing Phase

After the jury returned guilty verdicts and during the penalty phase of the trial, Assistant District Attorney Brian Johnson of Harris County, Texas, testified that the defendant had been convicted of aggravated robbery in his state in 1984. Walt Draper of the Davidson County Criminal Court Clerk's Office testified that the defendant had been convicted of two counts of first degree murder and one count of aggravated robbery on April 14, 1999. John Carney, Jr., District Attorney General for the Nineteenth Judicial District, testified that on September 22, 1999, the defendant had been convicted of two counts of first degree murder, two counts of especially aggravated kidnapping, and one count of aggravated robbery. The parties stipulated that each of these crimes involved the use of violence to the person.

Detective Postiglione pointed out the similarities between the crimes in this case and those that the defendant had committed earlier at a nearby Captain D's restaurant. According to the officer, the two separate criminal episodes took place at fast food restaurants. Both occurred on a Sunday while the restaurants were closed. In each instance, the restaurants had been locked following the crimes. In addition, there was no sign of forced entry at either restaurant. The defendant had used a small caliber weapon and in each incident, the victims were forced to lie face down in an isolated area of the restaurant before they were murdered. Each of the murder victims suffered two gunshot wounds to the head. Detective Postiglione testified that the modus operandi in each case was

unlike any other that had been used in Davidson County in at least fifteen years.

Robert Sewell's sister, Connie Chesmore, testified that the death of her twenty-three-year-old brother had affected their family "in every way." She stated that her father was too angry to attend the trial and that her grief-stricken mother was simply unable to testify. Another sister, Brenda Sewell, confirmed her mother's distressed emotional state, explaining, for example, that she could no longer prepare the family meals.

Ivette Rivera, the widow of Ronald Santiago, testified that both she and her daughter suffered extensively after her husband's death. Santiago's brother, Jamie Palmir, testified that his family had been devastated by the experience. He explained that their mother was unable to attend the trial because of poor health.

Doyle Brown testified that his seventeen-year-old daughter, Andrea Brown, attended Hume–Fogg High School, where she was an excellent student with many friends. His daughter had performed volunteer work at a homeless mission and aspired to be a chef. Brown, who believed he could not recover emotionally from his daughter's death, stated that he had kept both her room and her car, which was purchased on the day before her murder, exactly as they had been at the time of the shooting.

Dr. Xavier Amador, a witness for the defense, diagnosed the defendant as suffering from chronic paranoid schizophrenia. It was his opinion that the defendant experienced delusions that he was under constant government surveillance. Dr. Amador learned from the family members of the defendant that the defendant had suffered from delusions nearly all of his adult life and believed that he had been selected for a secret governmental mission which required constant surveillance. Dr.

Amador testified that the defendant, who had declared his intention to become a lawyer when "this is all over," believed that the government surveillance team would take care of his legal problems. The defendant was also diagnosed with anosognosia, a symptom of psychosis in which a person with a brain injury compulsively attempts to prove that he is free of a mental illness. Dr. Amador found that the defendant's brain had been "broken" by a series of head injuries as a child.

Dr. Pamela Auble, a neuropsychologist, examined the defendant, concluding that he experienced difficulty with language skills, lacked reasoning in complicated situations, and had lost motor skills as a result of brain injury. It was her opinion that the defendant did, in fact, suffer from delusions that he was under government surveillance. She explained that it was the defendant's belief that the inmate in the adjacent cell was a government agent assigned to either kill him or drive him crazy. Dr. Auble determined that the defendant was suffering from a psychotic disorder caused by his general medical condition, that he had a cognitive disorder which was caused by his previous head injuries, and that he was not malingering. It was her opinion that the psychotic and cognitive disorders had a "significant impact" on the defendant's criminal acts. On cross-examination, however, Dr. Auble acknowledged her awareness that the defendant had malingered in the past and that he had lied to others about statements she had made to him. She conceded that his crimes required planning and were not the result of impulse.

Patricia Allen, a language pathologist at Vanderbilt Medical Center, evaluated the defendant at the request of Dr. Auble. Upon reviewing the defendant's medical and school records, she learned that he had a chaotic childhood, living alternately

with his mother, grandmother, and father. She stated that the defendant's home environment hampered the development of normal speech and language skills. Allen confirmed that the defendant had suffered multiple head injuries as a child, testifying that in separate incidents, he had been hit in the back of the head with a brick, had fallen off of a bicycle, and had been hit by a car. She learned that the defendant had also been involved in a car accident as an adult resulting in a loss of consciousness. It was her conclusion that the defendant's behavior was consistent with his history of brain injury. Ms. Allen acknowledged that she did not test the defendant for malingering. She conceded that in many of the tests she administered, the defendant scored average and above average.

Dr. Robert Kessler, a neuroradiologist, conducted magnetic resonance imaging (MRI) and positron emission tomography (PET) scans on the defendant. He testified that the scans indicated shrinkage or atrophy of the left temporal lobe of the defendant's brain. It was his opinion that the defendant suffered from decreased glucose metabolism, which was the result of the dysfunction of the left temporal lobe. Dr. Kessler explained that the brain damage had likely been caused by a head injury when the defendant was seven or eight years old. He described the damage to the left temporal lobe as associated with psychotic disorders producing delusional states. Dr. Kessler acknowledged, however, that the injury would not have prevented the defendant from planning and executing the robbery and murders.

Dr. Helen Mayberg, a neurologist, also examined the defendant and testified in rebuttal for the State. While she agreed that the defendant suffered an abnormality of the left temporal lobe of his brain, it was her opinion that the damage was congenital rather than the result of any trauma. Dr. Mayberg testified that no single area of the brain could be associated with schizophrenia or psychosis. It was her conclusion that the damage to the defendant's left temporal lobe did not cause him to commit the crimes at issue.

At the conclusion of the penalty phase of the trial, the jury imposed sentences of death for each of the three counts of first degree murder. The jury found that four aggravating circumstances had been proven beyond a reasonable doubt, *see* Tenn. Code Ann. § 39–13–204(i)(2), (6), (7), (12) (Supp.1996), and that the evidence of aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt, *see* Tenn.Code Ann. § 39–13–204(g) (Supp.1996). Because the Court of Criminal Appeals affirmed the convictions and sentences, the appeal was automatically docketed in this Court. *See* Tenn.Code Ann. § 39–13–206(a)(1) (Supp. 1996).

## Analysis

### I. Competence

■■■ The defendant first asserts that the trial court erred by finding that he was competent to stand trial. The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit a mentally incompetent person from being put to trial. *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Blackstock,* 19 S.W.3d 200, 205 (Tenn. 2000). To be competent to stand trial, a criminal defendant must have " 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.' " *State v. Black,* 815 S.W.2d 166, 174 (Tenn.1991) (quoting *Mackey v. State,* 537 S.W.2d 704, 707 (Tenn.Crim.App. 1975)). The defendant bears the burden of establishing his incompetence by a prepon-

derance of the evidence. *State v. Reid,* 164 S.W.3d 286, 306–08 (Tenn.2005). The trial court's findings "are conclusive on appeal unless the evidence preponderates otherwise." *State v. Oody,* 823 S.W.2d 554, 559 (Tenn.Crim.App.1991).

Prior to trial, the trial court held extensive hearings on the issue of competence, took judicial notice of the expert testimony that had been presented during the penalty phase of the Captain D's trial, *see State v. Reid,* 91 S.W.3d 247, 267–71 (Tenn.2002) (for a summary of mental health evidence presented), and reviewed the proof presented at the defendant's competency hearing in the Baskin–Robbins case, *see Reid,* 164 S.W.3d at 303–06 (same). Mary Ann Hea, Reverend Joe Ingle, James Kyne, and Dr. Auble testified for the defense, and Dr. Daniel Martell testified on behalf of the State. Dr. Keith Caruso, Dr. Samuel Craddock, Dr. Rokaya Farooque, and Rebecca Smith served as independent experts appointed by the trial court.

Dr. Auble, who first examined the defendant during the trial of the Captain D's murders, testified at a hearing in the Baskin–Robbins case that the defendant was incompetent to stand trial. It was her testimony in this case that the defendant suffered from delusions and anosognosia, had difficulty conceptualizing, and had an increasing distrust of his attorneys. She opined that these disabilities prevented the defendant from consulting with his attorneys with any reasonable degree of factual understanding. Dr. Auble believed that the defendant labored under the delusion that his trial was a part of a larger conspiracy by the government to frame him for the murders so he would receive the death penalty. While she admitted that the defendant had a previous history of malingering, that he had rationally discussed many facets of his case with his attorneys, and that he understood the roles of the prosecutor, the judge, and the defense attorneys, Dr. Auble believed that the defendant's delusions had worsened over time.

Ms. Hea, a social worker employed by the Davidson County Public Defender's Office, testified that the defendant lacked trust in his attorneys and refused to talk with her about his case. She recalled that the defendant did discuss his childhood, television shows, his ambitions to become a lawyer when he was released from prison, and the possibility of marriage at some point in the future. Ms. Hea stated that the defendant had claimed that a portion of his brain had been removed and that he had the brain of a man half his age. She also recalled that the defendant had asked for documents from his previous trials so that he could work on his appeals.

Reverend Ingle, who had become the defendant's pastor through his work in prison ministries, spent more than seventy-five hours talking with the defendant. He found that the defendant did not focus on his trial strategy and instead tended to concentrate on irrelevant details. Reverend Ingle observed that the defendant expended a great deal of energy trying to appear normal, often watching and mimicking the behavior of others. It was his opinion that the defendant behaved much like a twelve-year-old boy.

James Kyne, who met the defendant through Reverend Ingle's prison ministry, testified that the defendant believed that the trial had a predetermined outcome. It was his opinion that the defendant had an irrational view of the judicial system. Kyne confirmed that the defendant claimed that he was under government surveillance.

Dr. Martell, a psychologist specializing in forensic psychology and neuropsychology, testified as a witness for the State at the competency hearing. He had evaluat-

ed the defendant prior to the Captain D's trial and had conducted a two-hour interview with the defendant on the day before he testified in this case. It was his opinion that during the most recent interview, the defendant was not suffering from hallucinations or delusions. He recalled that the defendant explained that his attorneys had decided to pursue a mental illness defense because of his convictions in the Baskin–Robbins case. According to Dr. Martell, the defendant understood from his attorneys that he might be spared the death penalty if they could establish that he was suffering from a mental illness. The defendant also informed Dr. Martell that Dr. Auble had previously indicated her desire to do all that she could to prevent him from being executed.

Dr. Martell testified that the defendant believed that the prosecutor was attempting to manufacture evidence by making the Captain D's and McDonald's murders appear similar. He stated that the defendant pointed out numerous discrepancies in the proof presented at the Captain D's trial as proof of his theory. The defendant also contended that he did not trust his attorneys because they were "killing him" through their incompetence. It was Dr. Martell's opinion that the defendant understood the legal process and was competent to stand trial. He stated that the defendant possessed an "acute understanding" of the trial procedures, including the roles of the judge, jury, defense attorneys, and prosecutors, and recognized the possibility of a death sentence. The defendant also understood that he had been charged with capital offenses. Dr. Martell testified that although he had previously diagnosed the defendant with a delusional disorder with grandiose and persecutory features, that condition appeared to be in remission.

Dr. Keith Caruso, an independent expert appointed by the trial court, met with the defendant on three occasions, reviewed the reports of other experts, and read the transcript of the competency hearing in the Baskin–Robbins case. It was Dr. Caruso's opinion that the defendant was incompetent to stand trial:

[H]e appears to have a schizo-affective disorder, bipolar type, most recent episode mixed, which includes both manic and depressive features. There are several symptoms that he has of that condition I feel that interferes with his competency at this time. I believe that he has persecutory paranoid grandiose delusions that involve the government and date back a number of years, but more recently have begun to incorporate [defense counsel], among others into his delusional system in that he has, that has impaired him because of his paranoia about [defense counsel] and [defense counsel's] motives. That has impaired him in his capacity to work with [defense counsel].

I believe also associated with the delusional system, he also has a thought disorder that is manifested by tangential speech, loosening of associations, preservative thought, concrete thought processes as well. I feel that it makes it difficult for him to reason and to think clearly at all times. I think there are times where he has windows where he appears to think clearly, but what I felt on that issue was that it was essentially that it was not predictable when those would occur, in that he does not have predictable competency. I feel he is incompetent in those areas as well.

I did feel that he had irrational as well as factual appreciation of the possible consequences of the charges against him.

It was also his opinion that the defendant was not malingering and, in fact, was attempting to appear normal.

Dr. Caruso, the only expert to diagnose the defendant with schizo-affective disorder, acknowledged that the defendant had been able to discuss trial strategies. He also conceded that the defendant provided a reasonable explanation as to why he did not want to offer mitigation evidence and that he understood court procedure, the roles of the parties, the purpose of the competency proceedings, the charges against him, and the nature of the legal proceedings. Dr. Caruso explained that the discrepancies between his findings and those of Dr. Martell were the result of the defendant's mood swings.

After hearing testimony from Drs. Auble, Martell, and Caruso, the trial court ordered that the defendant be evaluated by the Forensic Services Division of the Tennessee Department of Mental Health. Dr. Samuel Craddock, a forensic psychologist on the evaluation team, met with the defendant on five separate occasions and concluded that he was rational, competent, and prepared "to proceed with his trial." It was Dr. Craddock's opinion that the defendant understood the seriousness of the charges against him, had a factual understanding of the evidence, and was willing to cooperate with his attorneys to achieve the best possible outcome. Dr. Craddock acknowledged that certain aspects of the defendant's personality did interfere with his ability to work with his attorneys.

Dr. Craddock testified that the evaluation team diagnosed the defendant with mixed receptive and expressive language disorder, anti-social personality disorder, hearing loss in the left ear, and a congenital malformation of the left temporal lobe of the brain. It was his opinion that while the defendant had previously suffered from mental illness, he did not display any signs or symptoms of a delusional personality disorder. Dr. Craddock disagreed with the diagnoses of Drs. Auble and Caruso and did not believe that the defendant was delusional at the time of the competency hearing. Dr. Rokaya Farooque, a psychiatrist, and Rebecca Smith, a social worker, who were also part of the evaluation team, concurred with the findings of Dr. Craddock.

Dr. Auble testified in rebuttal at the competency hearing, expressing her belief that the defendant's mental condition was worsening. It was also her opinion that the defendant's trust in his legal counsel had deteriorated and she explained that the defendant's claim that he was willing to work with his attorneys was a part of his effort to appear normal.

At the conclusion of the hearing, the trial court found the defendant competent to stand trial, placing particular emphasis on statements by the defendant during a recorded session with Dr. Caruso. During that interview, the defendant expressed an understanding of the charges against him, the possible penalties, the roles of the judge and jury, the differences in procedure in capital and non-capital cases, the role of evidence in a trial, and specific incriminating evidence against him. The trial court determined that the defendant was able to consult with his counsel and otherwise assist in the preparation of his defense.

■ In our view, the evidence in the record does not preponderate against the trial court's finding that the defendant was competent to stand trial. The trial court heard and specifically accredited the testimony of Drs. Martell, Craddock, and Farooque. In addition, the trial court found that the defendant himself had expressed an understanding of the proceedings. Although the defendant had been diagnosed by Drs. Auble and Caruso with anosognosia, the trial court was free to assess their credibility and reject their expert testimo-

ny. Moreover, the trial court applied the correct legal standard: whether the defendant had " 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.' " *Black,* 815 S.W.2d at 174 (quoting *Mackey,* 537 S.W.2d at 707).

During the oral argument of this case, the defendant asked this Court to consider as a post-judgment fact that the State had conceded in an unrelated federal court proceeding that the defendant was not competent to waive his appeals under the standard announced in *Rees v. Peyton,* 384 U.S. 312, 314, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966). Under certain limited circumstances, this Court may consider facts which arise after entry of the trial court's judgment. *See* Tenn. R.App. P. 14; *State v. Williams,* 52 S.W.3d 109, 122 (Tenn.Crim.App.2001). The authority granted by Rule 14 "generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters." Tenn. R.App. P. 14(a). Facts not appropriate for consideration under Rule 14 include those which are merely cumulative, could be controverted or contested when presented to the trial court, and which might lead to differing opinions or conclusions. *Duncan v. Duncan,* 672 S.W.2d 765, 767–68 (Tenn.1984). Rule 14, therefore, "is not intended to permit a retrial in the appellate court." Tenn. R.App. P. 14, Advisory Commission Comments.

The defendant has a total of seven murder convictions with corresponding death sentences for each arising out of three separate trials. This case involves the direct appeal of the last of the three cases to be tried. Post-conviction litigation in the other two cases is pending in the State and Federal courts. The defendant's sister, Linda Martiniano, recently filed a petition for a stay of execution and a request to act as the defendant's next friend in the United States District Court for the Middle District of Tennessee, citing the defendant's incompetence as a basis for the motion and petition. The District Court ordered that the defendant be evaluated to establish his present competency. The State appeared in the District Court on August 24, 2006, and announced that it would "withdraw its objection" to Martiniano acting as next friend of the defendant "on the basis of a psychological examination that was conducted by our retained expert ... just last week ... which resulted in a finding by our expert a conclusion that [the defendant] is presently incompetent to make a rational decision to waive his capital appeals in accordance with the standards set forth in" *Rees v. Peyton.*

In a report attached to the defendant's motion, Dr. Martell states that the defendant is suffering from "very specific paranoid psychopathology (i.e., persecutory delusions) superimposed on an antisocial personality disorder, and against a backdrop that is otherwise largely within normal limits.... These findings are consistent ... with an Axis I diagnosis of Delusional Disorder." It is Dr. Martell's opinion that the defendant must be treated for his mental disease in order to meet the *Rees* standard. He pointed out, however, that Delusional Disorder "is one of the most difficult and intractable mental disorders to treat."

In our view, the State's concession and Dr. Martell's findings have little, if any, bearing on the issues presented in this direct appeal. While the defendant has raised the issue of his competence to stand

trial, a current finding of incompetence would not affect our analysis. *See Black,* 815 S.W.2d at 174 (" '[A] competency hearing is a very narrow inquiry aimed at determining whether one who is charged with a criminal offense is presently competent to stand trial.' " (quoting *State v. Stacy,* 556 S.W.2d 552, 553 (Tenn.Crim.App. 1977))); *cf. Berndt v. State,* 733 S.W.2d 119, 122 (Tenn.Crim.App.1987) (holding in a case considering whether the trial court should have conducted a competency hearing sua sponte that "an appellate court may only consider those facts which were before the court when the trial commenced"). Further, Dr. Martell opined during the competency hearing just before the trial in this case that the defendant's delusions were in remission and that he was competent at that point in time. That the defendant's condition is no longer in remission would have no impact on the trial court's finding of his competence to stand trial. The motion to consider post-judgment facts must, therefore, be denied.

Finally, the defendant has asked this Court to supplement the record with the transcript of the federal proceeding, including Dr. Martell's report. Because we have determined that neither the transcript nor the report may be considered under Tennessee Rule of Appellate Procedure 14, it is our view that the record should not be supplemented with these documents.

## II. Testimony of Mitchell Roberts

The defendant asserts that the trial court should have excluded testimony that, shortly after the crimes, he possessed a small caliber, automatic handgun and a double-bladed knife. Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). At trial, Mitchell Roberts, the defendant's former employer, testified that the defendant possessed the gun and the knife after the commission of the crimes. The Court of Criminal Appeals ruled that the trial court did not err by admitting the testimony, reasoning that the evidence was relevant and not prohibited by Tennessee Rule of Evidence 404(b) because the possession of a weapon is not necessarily a crime or wrongful act. We agree.

Other jurisdictions have ruled similarly in these circumstances. For example, in *Busey v. United States,* the Court of Appeals for the District of Columbia ruled that "testimony that Busey possessed a revolver that might have been the murder weapon was not admitted improperly to establish criminal propensity. That evidence was directly relevant ... because it constituted evidence supporting the charge that Busey was the person who" committed the crimes charged. *Busey v. United States,* 747 A.2d 1153, 1165 (D.C.App. 2000). That court has also ruled that "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." *Coleman v. United States,* 379 A.2d 710, 712 (D.C.App.1977). Similarly, in *People v. Houston,* the Michigan Court of Appeals determined that proof that Houston had possessed a .380 handgun three days before the victim was murdered with the same caliber weapon "was directly relevant to identifying defendant as the killer," concluding that the evidence was not inadmissible under Rule 404(b) because the "mere possession of a pistol is not a crime." *People v. Houston,* 261 Mich.App. 463, 683 N.W.2d 192, 195–96 (2004). In *Williams v. State,* the Indiana Supreme Court observed that "[i]t is by no means clear that weapons possession, evidence of gun sales, and the like, are necessarily

prior 'bad acts' for 404(b) purposes." *Williams v. State*, 690 N.E.2d 162, 174–75 (Ind.1997). Finally, the Maryland Supreme Court has also agreed that the defendant's possession of guns or ammunition does not qualify as a bad act under the evidentiary rules. *Klauenberg v. State*, 355 Md. 528, 735 A.2d 1061, 1073 (1999).

Under Tennessee law, it is a crime to carry a firearm or large knife with the "intent to go armed." *See* Tenn.Code Ann. § 39–17–1307 (2003). Nevertheless, weapons of the type described by Roberts, a double-bladed knife and a small caliber weapon, may be lawfully possessed under a variety of circumstances. *See* Tenn. Code Ann. § 39–17–1308 (2003). In our view, the ownership of these weapons, standing alone, does not constitute a crime. The testimony that Roberts saw the defendant in the possession of weapons similar to those used in the crimes did not necessarily constitute evidence of a bad act. Because of the weapons' similarity to those described by the victim Gonzales, the evidence was especially probative as to the identity of the perpetrator. The trial court did not err by admitting the testimony of Mitchell Roberts.

### III. Defendant's Financial Condition

The defendant contends that the trial court erred by admitting testimony that he left his employment at a Shoney's restaurant in February of 1997, received no severance pay, and was unemployed at the time of the crimes. He asserts that evidence of his poverty was irrelevant under Tennessee Rule of Evidence 401. In the alternative, he contends that the evidence should have been excluded as more prejudicial than probative under Tennessee Rule of Evidence 403.

Several jurisdictions have concluded that the poverty of an accused is generally inadmissible as proof of a motive for theft or robbery because its probative value is outweighed by the danger of unfair prejudice. *See United States v. Mitchell*, 172 F.3d 1104, 1108–10 (9th Cir.1999); *see also United States v. Weller*, 238 F.3d 1215, 1220–21 (10th Cir.2001); *United States v. Zipkin*, 729 F.2d 384, 390 (6th Cir.1984); *United States ex rel. Mertz v. New Jersey*, 423 F.2d 537, 541–42 (3d Cir.1970); *Davis v. United States*, 409 F.2d 453, 457–58 (D.C.Cir.1969); *People v. Harris*, 37 Cal.4th 310, 33 Cal.Rptr.3d 509, 118 P.3d 545, 570 (2005); *State v. Kennard*, 101 Wash.App. 533, 6 P.3d 38, 42 (2000). A majority, however, have determined that evidence of a defendant's poverty is admissible when coupled with proof of an unexplained improvement in his financial status. *See, e.g., United States v. Bensimon*, 172 F.3d 1121, 1129 (9th Cir.1999) ("To be admissible ... poverty evidence must be accompanied by something more, such as an 'unexplained, abrupt change in circumstances.'" (quoting *Mitchell*, 172 F.3d at 1109)).

In our view, evidence that a defendant is poor, without more, has little probative value. As observed by the Ninth Circuit Court of Appeals, "A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, without more, is likely to amount to ... unfair prejudice with little probative value." *Mitchell*, 172 F.3d at 1108–09. The better rule, therefore, is that the State must introduce proof of "something more" than a defendant's poverty in order to meet the threshold of relevance necessary for admission.

In this instance, "something more" was proof that despite the loss of his job without severance pay, the defendant had made several cash purchases totaling in excess of $800, had sought to invest $3000, and had over $1000 in coins

in his possession at the time of his arrest. That the defendant had no legitimate source of income following the termination of his employment, coupled with proof of these expenditures shortly after the robbery, was relevant, circumstantial evidence of the commission of the crimes. Accordingly, the trial court did not err in admitting testimony about his financial condition at the time of the crimes.

## IV. Recusal

The defendant also asserts that the trial judge erred by denying his motion for recusal. He contends that because the same trial judge had presided over the Captain D's trial, the judge was unable to impartially exercise her role as thirteenth juror in this case. *See generally State v. Carter,* 896 S.W.2d 119, 121–22 (Tenn. 1995) (for a history and explanation of the thirteenth juror rule). He also argues that the trial judge's comments during the competency hearing demonstrated that she had an opinion on that issue prior to hearing the evidence.

The Court of Criminal Appeals ruled "that the judge's participation in [d]efendant's previous capital murder trial" did not "color[ ] her rulings in this case in any regard." That court also concluded that "the judge's remarks and actions at the competency hearing did not indicate partiality ... and did not warrant recusal."

■ "The right to a fair trial before an impartial tribunal is a fundamental constitutional right." *State v. Austin,* 87 S.W.3d 447 app. at 470 (Tenn.2002). "[T]he preservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial." *Kinard v. Kinard,* 986 S.W.2d 220, 228 (Tenn.Ct.App.1998). Recusal is warranted "when a person of ordinary prudence in the judge's position, knowing all

of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Alley v. State,* 882 S.W.2d 810, 820 (Tenn.Crim.App.1994). "Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis v. Liberty Mut. Ins. Co.,* 38 S.W.3d 560, 565 (Tenn. 2001). "Whether recusal is necessary ... rests within the discretion of the trial court." *State v. McCary,* 119 S.W.3d 226, 260 (Tenn.Crim.App.2003) (citing *Caruthers v. State,* 814 S.W.2d 64, 67 (Tenn.Crim. App.1991)). This Court will not interfere with the trial court's discretion unless clear abuse appears on the face of the record. *Caruthers,* 814 S.W.2d at 67.

■ A trial judge is not disqualified because that judge has previously presided over legal proceedings involving the same defendant. *See State v. Hines,* 919 S.W.2d 573, 578 (Tenn.1995) ("'A judge is in no way disqualified because he tried and made certain findings in previous litigation.'" (quoting *King v. State,* 216 Tenn. 215, 391 S.W.2d 637, 642 (1965))). Moreover, "[p]rior knowledge of facts about the case is not sufficient in and of itself to require disqualification." *Alley,* 882 S.W.2d at 822.

■ In this instance, the defendant has simply been unable to establish that the trial judge's participation in the prior trial prevented her from exercising her role as thirteenth juror free from bias. The approval of the prior verdict, standing alone, is not cause for recusal. The defendant asserts, however, that there was other evidence of partiality. He points to a comment by the trial judge, who explained that because she was familiar with the proof presented during his previous two trials, she had little interest in relitigating the issues resolved during those trials.

The defendant asserts that this is evidence of a predisposition on the part of the trial judge.

In our assessment, the actions of the trial court were designed to expedite the litigation. That the trial judge ruled that the evidence would be limited to proof of the defendant's existing mental state, as opposed to his mental state at the prior trials, did not establish that she had formed an opinion with regard to competence. The issue of competence is, of course, to be determined at the time of trial. *See Black,* 815 S.W.2d at 174. An adverse ruling does not necessarily indicate bias or prejudice. *Alley,* 882 S.W.2d at 821. Moreover, comments reflecting "insensitivity and lack of sympathy on the part of the judge" are insufficient to establish impartiality unless they are pervasive and accompanied by prejudicial conduct. *Id.* at 822. Because the defendant has failed to establish that the trial judge acted inappropriately, recusal was not required.

### V. Mass Murder Aggravating Circumstance

The defendant contends that the trial court erred during the penalty phase of the trial by permitting the State to introduce evidence of the murders at the Captain D's restaurant as a means of establishing the "mass murder" aggravating circumstance. He argues that because the trial court excluded the evidence during the guilt phase of the trial, the jury should not have been permitted to consider the prior convictions in their deliberation on capital punishment.

At the time of the offenses, the "mass murder" aggravating circumstance was defined as follows: "The defendant committed 'mass murder,' which is defined as the murder of three (3) or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in

a similar fashion in a common scheme or plan." Tenn.Code Ann. § 39–13–204(i)(12) (Supp.1996). In *State v. Bobo,* 727 S.W.2d 945 (Tenn.1987), this Court examined this particular aggravating circumstance in detail, concluding that it "may be constitutionally applied if the triggering offenses are shown only by convictions that have been entered prior to the sentencing hearing at which they are to be utilized." *Bobo,* 727 S.W.2d at 955. Later, this Court recognized that "the 'mass murder' aggravating circumstance [is] appropriate for a series of separate but related homicides committed as part of a common scheme or plan." *State v. Smith,* 868 S.W.2d 561, 582 (Tenn.1993).

The defendant argues that the "mass murder" circumstance was not applicable because the trial court had previously determined that the murders at the Captain D's and McDonald's were not part of a common scheme or plan. The record establishes that the State initially sought to introduce proof of the prior murder convictions during the guilt phase of the trial under Tennessee Rule of Evidence 404(b) in an effort to establish the defendant's identity as the perpetrator. While determining that the murders at the two restaurants were part of a common scheme or plan, the trial court nevertheless excluded the evidence because the probative value was outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b). "[I]t comes down to ... a weighing process," the trial court observed, "[W]hat I would be asking the jury to do would be to hear proof about other homicides and then disregard it, and I'm not so sure that is even humanly possible to do."

The trial court excluded the evidence during the guilt phase by the application of Rule 404(b). The standard for admission of prior convictions during the guilt phase, however, is different than

the standard in the penalty phase. While the Rules of Evidence govern the former, the latter standard is statutory. Tennessee Code Annotated section 39–13–204(c) provides, in pertinent part, as follows:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. *Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence;* provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. . . .

Tenn.Code Ann. § 39–13–204(c) (2003) (emphasis added). The rules of evidence, therefore, do not limit the admissibility of evidence in a capital sentencing proceeding. *State v. Stout,* 46 S.W.3d 689, 702 (Tenn.2001) (citing *Van Tran v. State,* 6 S.W.3d 257, 271 (Tenn.1999)). Our statute empowers " 'trial judges [with] wider discretion than would normally be allowed under the Tennessee Rules of Evidence' " in the admission of evidence during the penalty phase of a capital case. *Id.* at 703 (quoting *State v. Sims,* 45 S.W.3d 1, 14 (Tenn.2001)). "The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant." *Sims,* 45 S.W.3d at 14. Because the rules of evidence "are too restrictive and unwieldy in the arena of capital sentencing," the terms of the statute apply. *Id.* The question here is not whether the Captain D's murder convictions were admissible under Tennessee Rule of Evidence 404(b), but instead whether that evidence was reliable and relevant to one of the aggravating or mitigating circumstances.

Detective Postiglione testified during the penalty phase that the murders of the McDonald's employees were similar to those the defendant had committed at the Captain D's. The State submitted that the murders qualified, under the statutory definition, as a common scheme or plan, a necessary component of the "mass murder" aggravating circumstance. *See* Tenn. Code Ann. § 39–13–204(i)(12) (Supp.1996).

Indeed, each of the murders took place at a franchised, fast food restaurant. There were other similarities. The crimes were committed when the restaurants were closed but while the employees remained inside. There were robberies at each location. The victims in each instance were moved to an isolated area, ordered to the floor, and shot twice in the head. The offenses occurred within thirty-five days of each other. While perhaps falling short of the criteria for admission under Rule 404, these comparable elements satisfy the terms of the statute. The prior convictions were also admitted to prove that the defendant had previously committed felonies involving violence. *See* Tenn.Code Ann. § 39–13–204(i)(2) (Supp. 1996). The convictions for the prior murders were reliable and relevant to the issue of punishment in this case. Thus, the trial court did not err by allowing proof of the convictions in order to establish the "mass murder" aggravating circumstance.

In *State v. Branam,* 855 S.W.2d 563, 570 (Tenn.1993), we held that the trial court

should not have instructed the jury on the aggravating circumstance under Tennessee Code Annotated section 39–13–204(i)(6) where there was "not a shred of evidence in the record" to support the claim. Here, however, the State presented reliable evidence that the defendant had committed two murders at the Captain D's and established that there were significant commonalities with the crimes in this case. Thus, the trial court did not err by submitting the "mass murder" aggravating circumstance to the jury.

### VI. Mandatory Review Pursuant to Tenn.Code Ann. § 39–13–206(c)(1)

Pursuant to Tennessee Code Annotated section 39–13–206(c)(1), this Court must determine whether the evidence supported the jury's finding that the aggravating circumstances were established beyond a reasonable doubt and that the aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–206(c)(1)(B)–(C) (2003). The record establishes that the jury found that four aggravating circumstances had been proven beyond a reasonable doubt:

(2) The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;

. . . .

(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;

(7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing

or attempting to commit . . . robbery . . .;

. . . .

(12) The defendant committed "mass murder," which is defined as the murder of three (3) or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan; . . . .

Tenn.Code Ann. § 39–13–204(i)(2), (6), (7), (12) (Supp.1996).

### A. Prior Violent Felonies

██ The evidence adduced during the sentencing hearing established that the defendant had been convicted of aggravated robbery in 1984 in Texas; two counts of first degree murder and one count of aggravated robbery on April 14, 1999, in Davidson County; and two counts of first degree murder, two counts of especially aggravated kidnapping, and one count of aggravated robbery on September 22, 1999, in Montgomery County. The parties stipulated that each of these crimes involved the use of violence to the person. This evidence is sufficient to establish the prior violent felony aggravating circumstance.

### B. Avoiding, Interfering With, or Preventing Lawful Arrest

██ Two of his former co-workers testified that the defendant had discussed robbing fast food restaurants as a means of making money. Danny Tackett and Jeffrey Potter each recalled that the defendant, who was experiencing financial difficulties, talked about robbing a fast food restaurant in the middle of the night and leaving no witnesses. In our view, this evidence is sufficient to support the application of the aggravating circumstance for avoiding, interfering with, or preventing lawful arrest.

### C. Felony Murder

■■■ The proof at trial overwhelmingly established that the murders were perpetrated during the robbery of the McDonald's. Gonzales testified that the defendant demanded cash from the restaurant safe. He stated that Santiago gave the money to the defendant, who then stashed it in a bag he was carrying. The defendant then ordered the employees to lie on the floor before shooting Santiago, Sewell, and Brown twice in the back of the head. Under these circumstances, it is our view that the evidence is sufficient to establish the felony murder aggravating circumstance.

### D. "Mass Murder"

"[F]or this section to apply, the State must show beyond a reasonable doubt (1) that the defendant had been *convicted* of three or more murders, including the one for which he has just been tried, (2) within the State of Tennessee, (3) within a period of forty-eight (48) months, (4) perpetrated in a similar fashion, and (5) in a common scheme or plan."

*Black,* 815 S.W.2d at 183 (quoting *Bobo,* 727 S.W.2d at 956). Little has been written with regard to this factor, which is unique to Tennessee. *See Bobo,* 727 S.W.2d at 951; *cf.* Ohio Rev.Code Ann. § 2929.04(5) (2006) (providing as an aggravating circumstance that the defendant "was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.") This Court has approved of its application in a case where the defendant shot his four children in the garage of his residence, *see State v. Holton,* 126 S.W.3d 845, 865 (Tenn.2004); in a case

where the defendant stabbed, shot, and disemboweled his estranged wife and her two children, *see Smith,* 868 S.W.2d at 582; in a case where the defendant killed his girlfriend and her children, *see Black,* 815 S.W.2d at 184; and in a case where the defendant killed three people during the robbery of a restaurant, *see State v. Van Tran,* 864 S.W.2d 465, 478 (Tenn.1993). The Court of Criminal Appeals has also approved of the application of this aggravating circumstance in a sentence of life without parole where the defendants killed three members of the same family at a rest stop. *See State v. Howell,* 34 S.W.3d 484, 509 (Tenn.Crim.App.2000).

■■■ In this case, the State points to fourteen similarities between the murders committed in this case and those committed at the Captain D's. The murders in each instance were committed at a fast food restaurant on a Sunday while the restaurants were closed. The victims in each case were forced to lie on the floor in an isolated area of the restaurant. Each victim was shot at least twice with a small caliber weapon. The restaurants were locked after the crimes. The murders occurred thirty-five days apart at restaurants only three miles apart. Both cash and coins were taken from the safe. Detective Postiglione testified that the modus operandi in the two incidents was unlike any other which had been used in Davidson County in at least fifteen years. In our view, this evidence was sufficient to establish the "mass murder" aggravating circumstance.

### E. Weighing of Mitigating Evidence

■■■ In mitigation of his offenses, the defendant presented evidence of his unstable childhood, his prior brain injuries, and his mental illness. Dr. Amador testified that the defendant had been abandoned by his mother at a young age and had lived

periodically with his father and grandmother until he was an adolescent, when he returned to his mother. Dr. Amador made reference to the defendant's various head injuries and made a diagnosis of chronic schizophrenia, paranoid type. It was the opinion of Patricia Allen that the defendant's language and thinking fit the profile of a person with acquired brain injuries. Dr. Auble diagnosed the defendant with a psychotic disorder and personality changes caused by head trauma. Dr. Mayberg, testifying for the State, could find no evidence linking the defendant's brain abnormalities with his commission of the murders in this case.

While the mitigating evidence was compelling, the proof of the aggravating circumstances was simply overwhelming. The evidence supports the jury's conclusion that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

### F. Proportionality Review

When a defendant has been sentenced to death, this Court is required to engage in a comparative proportionality analysis. Tenn.Code Ann. § 39–13–206(c)(1)(D) (2003). "[C]omparative proportionality review 'presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.' " *State v. Bland,* 958 S.W.2d 651, 662 (Tenn.1997) (quoting *Pulley v. Harris,* 465 U.S. 37, 42–43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)). "[T]his Court employs the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes.... [A] death sentence is dispro-

portionate if a case is 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.' " *State v. Davis,* 141 S.W.3d 600, 619–20 (Tenn.2004) (quoting *Bland,* 958 S.W.2d at 668). "[T]he pool of cases considered by this Court ... includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." *Id.* at 620.

While there is no specific formula for comparing similar cases, this Court generally considers the following factors regarding the offense:

(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*Id.* This Court must also consider the following factors about the defendant: "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Id.* (citing *Bland,* 958 S.W.2d at 667; *State v. Bane,* 57 S.W.3d 411, 428–29 (Tenn.2001)).

In this case, the defendant confronted three of the victims just outside the McDonald's. A fourth victim was inside the restaurant. The defendant demanded the contents of the safe, ordered the victims to the floor of a storage area, and murdered three of the four victims

execution-style before his gun malfunctioned. When shot, the victims were in a defenseless position. The defendant then kicked and stabbed the fourth victim repeatedly and discontinued his attack only when the victim pretended to be dead.

The defendant had previously been convicted of several serious, violent felonies, including first degree murder, especially aggravated kidnapping, and aggravated robbery. Although the defendant had a tumultuous childhood and experienced mental and behavioral problems from an early age, possibly as the result of a brain injury or a congenital disorder, there was some indication of malingering. There was no evidence of remorse, cooperation with the authorities, or potential for rehabilitation.

Sentences of death have been upheld by this Court for this defendant under similar circumstances. In our proportionality review in the Captain D's case, this Court concluded that "[w]hile no two capital cases and no two defendants are alike, we have compared the circumstances of the present case with the circumstances of similar first degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases." *Reid*, 91 S.W.3d at 287. In that case, the defendant was convicted of two counts of first degree murder and sentenced to death for the killing of two Captain D's employees during the robbery of the restaurant. Furthermore, this Court upheld the defendant's sentences of death for the robbery, kidnapping, and murder of two Baskin–Robbins employees. *Reid*, 164 S.W.3d at 317–18. The victims in that case were transported to a nearby park and stabbed to death. *Id.*

This Court has repeatedly affirmed the sentence of death in other cases where the victim was shot to death during a robbery.

See, e.g., *Davis*, 141 S.W.3d at 622; *State v. Powers*, 101 S.W.3d 383, 405 (Tenn. 2003); *State v. Chalmers*, 28 S.W.3d 913, 920 (Tenn.2000); *Van Tran*, 864 S.W.2d at 482; *State v. Howell*, 868 S.W.2d 238, 262 (Tenn.1993); *State v. Harris*, 839 S.W.2d 54, 77 (Tenn.1992); *State v. King*, 694 S.W.2d 941, 947 (Tenn.1985). In addition, we have upheld the death sentence in a number of cases where the defendant has presented similar mitigating evidence. See, e.g., *Davis*, 141 S.W.3d at 621; *State v. Middlebrooks*, 995 S.W.2d 550, 565 (Tenn.1999); *Hines*, 919 S.W.2d at 584.

In our view, this case is not " 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.' " *Davis*, 141 S.W.3d at 620 (quoting *Bland*, 958 S.W.2d at 668). Nor can we conclude that the sentence of death was imposed in any arbitrary fashion. *See* Tenn.Code Ann. § 39–13–206(c)(1)(A) (2003). In consequence, we hold that the sentences of death were not disproportionate.

## Conclusion

The trial court did not err during the course of the trial by finding the defendant competent to stand trial; by admitting testimony that the defendant had possessed weapons similar to those used in the crimes; by denying the defendant's motion to limit proof of his financial condition; or by denying the defendant's motion to recuse. Further, the trial court did not err during the penalty phase by allowing the State to introduce evidence of the murders at the Captain D's restaurant to establish the "mass murder" aggravating circumstance. Finally, we conclude that the defendant's sentences of death are not disproportionate under the mandatory review criteria of Tennessee Code Annotated section 39–13–206(c)(1).

Accordingly, the judgment of the Court of Criminal Appeals is affirmed. The sen-

tence of death shall be carried out on the 3rd day of January, 2008, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, the costs of this appeal are taxed to the State.

ADOLPHO A. BIRCH, JR., SP. J., concurred in part and dissented in part.

## APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT NASHVILLE

November 17, 2004 Session

**STATE OF TENNESSEE v. PAUL DENNIS REID, JR.**

**Criminal Court for Davidson County**

No. 97–C–1836

No. M2003–00539–CCA–R3–DD–Filed June 3, 2005

Defendant Paul Dennis Reid, Jr., was found guilty by a jury of three counts of premeditated murder, three counts of felony murder, one count of attempted murder, and one count of especially aggravated robbery. The felony murder convictions were merged into the premeditated murder convictions. Thereafter, the jury sentenced Defendant to death based upon the finding of four aggravating circumstances: the defendant had previously been convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; the murders were committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of defendant or another; the murder was knowingly committed, solicited, directed or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit robbery; and the defendant committed "mass murder," which was defined at the time of the commission of these offenses as the murder of three or more persons within the State of Tennessee within a period of forty-eight months, and perpetrated in a similar fashion in a common scheme or plan. Tenn.Code Ann. § 39–13–204(i)(2), (6), (7), and (12) (Supp.1996). The trial court sentenced Defendant to 25 years imprisonment for the attempted murder conviction and 25 years imprisonment for the especially aggravated robbery conviction, to be served consecutively to each other and to Defendant's other non-death sentences. On appeal, Defendant presents forty-seven issues. We affirm Defendant's convictions and sentences.

**Tenn. R.App. P. 3 Appeal as of Right; Judgment of the Criminal Court for Davidson County Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined

Thomas F. Bloom and James A. Simmons, Nashville, Tennessee, for the appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Angele M. Gregory, Assistant Attorney General, for the appellee, State of Tennessee

### OPINION

*[Deleted: SUMMARY OF FACTS]*

*[Deleted: PROOF]*

### ANALYSIS

On appeal, Defendant has presented multiple issues, which we will address as follows.

**1. Failure to dismiss indictment because aggravating factors not listed in indictment**

■ First, Defendant contends that because the indictment returned against him did not set forth the statutory aggravating circumstances relied upon by the State in charging him with a capital offense, the indictment is faulty and must be dismissed. Defendant acknowledges that he made this same argument in the appeal of his Montgomery County convictions and sentences, but it was rejected by this court. Defendant urges this court to reconsider its decision in *State v. Reid*, No. M2001–02753–CCA–R3–DD, 2003 WL 23021393 (Tenn.Crim.App., Nashville, Dec. 29, 2003). However, the Tennessee Supreme Court has released its opinion in the appeal of Defendant's Montgomery County convictions, and the Court reaffirmed its earlier decisions in holding that "Tennessee's capital sentencing scheme does not require that aggravating circumstances be included in an indictment." *State v. Reid*, 164 S.W.3d 286, 312 (Tenn. 2005). Accordingly, the trial court did not err in refusing to dismiss the indictment. Defendant is not entitled to relief on this issue.

**2. Constitutionality of Tenn Code Ann. Sec. 39–13–204(c)**

Defendant contends that Tennessee Code Annotated Section 39–13–204(c) is unconstitutional. However, he has not presented any constitutional challenges to the death penalty statutes that have not been previously reviewed and rejected. The death penalty statutes have repeatedly been held constitutional. *See e.g., State v. Keen*, 31 S.W.3d 196, 233 (Tenn.2000), *cert. denied*, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); *State v. Nesbit*, 978 S.W.2d 872, 902 (Tenn.1998), *cert. de-*

nied, 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999); *State v. Vann*, 976 S.W.2d 93, 117 (Tenn.1998), *cert. denied*, 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); *State v. Bland*, 958 S.W.2d 651, 663 (Tenn.1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998); *State v. Smith*, 857 S.W.2d 1, 21–22 (Tenn.), *cert. denied*, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); *State v. Bane*, 853 S.W.2d 483, 488 (Tenn.1993), *cert. denied*, 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994).

■ Defendant relies upon the case of *United States v. Fell*, 217 F.Supp.2d 469 (D.Vt.2002) in arguing that Tennessee's capital sentencing scheme, particularly Tennessee Code Annotated Section 39–13–204(c), is unconstitutional because it allows the death penalty to be imposed based on evidence that is not subject to the guarantees of reliability and trustworthiness required by the due process and confrontation clauses of the federal constitution. However, the Supreme Court rejected this argument recently in *State v. Berry*, 141 S.W.3d 549 (Tenn.2004). Defendant is not entitled to relief on this issue.

**3. Validity of search warrants**

Defendant contends the trial court erred in denying his motion to suppress evidence seized pursuant to search warrants 146 and 149. Defendant concedes that this issue has been decided against him adversely in *State v. Reid*, 91 S.W.3d 247 (Tenn.2002), but makes the argument for the purpose of preserving the issue for further review. This court must follow the holding of the Tennessee Supreme Court on this issue as set forth in *State v. Reid*, 91 S.W.3d at 273–76. Defendant is not entitled to relief on this issue.

4. [Deleted: Evidence of Defendant's financial condition]

5. [Deleted: Testimony of Mitchell Roberts]

6. Admissibility of identification testimony

█ Next, Defendant contends that the trial court erred in failing to suppress Jose Gonzales' identification of him. In his motion to suppress, Defendant argued that the photographic lineup conducted by the Metropolitan Nashville Police Department was unduly suggestive and resulted in an unreliable identification. In support of his motion, Defendant specifically argued that the background of his photograph is lighter in color than the other photographs; that Defendant is the only person pictured smiling; that Defendant's picture was placed in the center top row where a viewer's eye is naturally drawn; that the viewing of the photographic lineup in question occurred at night, unlike the other viewings by Gonzales; that the photographic lineup in question was different because Gonzales had viewed all of the previous photographs in a book; and that there was a heightened sense of excitement on the night of the lineup in question. The trial court rejected each of Defendant's arguments and found that the lineup and the procedures used in displaying the lineup were not unduly suggestive.

The trial court was very specific in its order denying Defendant's motion to suppress Gonzales' identification. The court found that although the background of Defendant's picture is lighter than the backgrounds of the other five photographs, none of the backgrounds depicted in the pictures are identical. Additionally, the court found that the physical characteristics of the men depicted in the photographs are quite similar in many respects.

As a result, the backgrounds in no way suggest that the viewer should select a particular photograph. The court also acknowledged that Defendant was the only person who showed his teeth in his photograph, but found that each photograph had a unique characteristic. Accordingly, the viewer's eye is not attracted to one particular photograph. The court rejected Defendant's contention that the placement of Defendant's photograph in the top center of the lineup drew the viewer's eye to that particular picture. The court found that Defendant had not presented any evidence to support this contention. The court further found that there was no evidence that Gonzales was aware that an arrest was imminent and that other witnesses had been called to the police station to view lineups. Additionally, the court found that the fact that Gonzales viewed the lineup at night was insignificant. The court determined that there had not been a formal or rigid viewing schedule prior to the night in question. Instead, the testimony revealed that the prior meetings were arranged as schedules and Gonzales' medical condition permitted. The court also found that there was no evidence that Gonzales' identification was affected by the viewing of the lineup in a different format than before. Although Gonzales may have only viewed photographs in a book, his identification was not affected by viewing the six picture photographic lineup presented to him. The court also rejected Defendant's contention that a physical lineup would have been more trustworthy and should have been conducted. The court noted that Gonzales had never been asked to view a physical lineup in the past, and the court opined that a physical lineup would have drawn more attention to the importance of that particular viewing. The court also surmised that the police did not have adequate time to locate men who had similar physical characteristics to conduct

a physical lineup given all of the circumstances. Based on the foregoing, the court concluded that the lineup and the procedures utilized in displaying the lineup were not unduly suggestive.

■ This court first notes that the findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross,* 49 S.W.3d 833, 839 (Tenn.2001). Absent a showing by Defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court. *State v. Cribbs,* 967 S.W.2d 773, 795 (Tenn.), *cert. denied,* 525 U.S. 932, 119 S.Ct. 343, 142 L.Ed.2d 283 (1998).

■ As the trial court correctly espoused, the United States Supreme Court established a two-part test to assess the validity of a pretrial identification in *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Specifically, the court must determine (1) whether the procedure used to obtain the identification was unduly suggestive and (2) if the identification was unduly suggestive, the court must determine, under the totality of the circumstances, whether the identification is nevertheless reliable. *Id.* After a review of the record, this court must concur with the trial court's findings that the lineup and the procedures used in the lineup were not unduly suggestive. The evidence does not preponderate against the findings of the trial court. Defendant is not entitled to any relief on this issue.

**7. Court hours**

Defendant contends that the trial court erred in holding "late night" court sessions in this case. Prior to trial, Defendant filed a "Motion for Reasonable Court Hours During Jury Selection and Trial." Defendant requested that court hours be limited to 9:00 a.m. to 5:00 p.m. The trial court ruled that the court hours would be the same as those held in Defendant's prior Davidson County case, in which Defendant was tried and convicted of the murders of two Captain D's employees. The following schedule was followed by the trial court:

*JURY SELECTION:*

May 15: 9:00 a.m.—Court called into session
7:15 p.m.—Court adjourned for the day

May 16: 9:00 a.m.—Court resumed
6:45 p.m.—Court adjourned for the day

May 17: 9:00 a.m.—Court resumed
8:00 p.m.—Court adjourned for the day

May 18: 9:00 a.m.—Court resumed
5:05 p.m.—Court adjourned for the day

May 19: 9:00 a.m.—Court resumed
The record does not reflect the time court was adjourned. The trial court asserts that court was adjourned at 4:00 p.m.

THREE DAY BREAK BETWEEN JURY SELECTION AND TRIAL

*TRIAL*

May 22: 8:30 a.m.—Trial proceedings began; jury-out proceedings
10:00 a.m.—Jury brought into court
7:30 p.m.—Jury excused for the day
7:55 p.m.—Court adjourned for the day

May 23: 8:30 a.m.—Court resumed
7:30 p.m.—Jury excused for the day
7:50 p.m.—Court adjourned for the day

May 24: 8:30 a.m.—Court resumed
4:26 p.m.—Jury retired to jury room for deliberations
8:37 p.m.—Jury excused for the day
8:39 p.m.—Court adjourned for the day

May 25: 8:30 a.m.—Court resumed
8:53 a.m.—Jury retired to jury room for deliberations
8:50 p.m.—Jury returned to court to announce verdict
8:56 p.m.—Jury excused for the day
9:05 p.m.—Court adjourned for the day

May 26: 8:30 a.m.—Court resumed; jury-out hearing conducted
10:34 a.m.—Jury returned to open court for penalty phase testimony
7:25 p.m.—Jury excused for the day
7:55 p.m.—Court adjourned for the day

May 27: 8:30 a.m.—Court resumed; jury-out hearing conducted

8:42 a.m.—Jury returned to open court and penalty phase resumed
2:42 p.m.—Jury retired to the jury room for deliberations on the sentence
6:35 p.m.—Jury returned to open court and announced its sentence

In *State v. Parton*, 817 S.W.2d 28 (Tenn. Crim.App.1991), this court addressed the issue of "late night" court sessions as follows:

It is clear in this state that late night court sessions should be scheduled "only when unusual circumstances require it." [*State v.*] *McMullin*, 801 S.W.2d [826], 832 [ (Tenn.Crim.App.1990) ]. Regardless of whether counsel or any juror objects, the late night sessions should be avoided; and they must be justified because of unusual circumstances. If the requisite unusual circumstances do exist and late night sessions are scheduled because of necessity, good practice would be to also let the record affirmatively reflect that all counsel and all jurors expressly agree. But the threshold question which must always be determined by the court is whether the circumstances justify the unusual session.

*Id.* at 33.

In his appeal of his convictions and sentences of the Captain D' murders, Defendant argued that the trial court committed reversible error by holding late night court sessions. In that case, this court rejected Defendant's arguments. This court specifically found that the record did not support Defendant's argument that the court kept excessively late hours during trial, and the Tennessee Supreme Court affirmed this court's decision and published that portion of the opinion as an appendix to its opinion. *State v. Reid*, 91 S.W.3d 247, 288, 300–01 (Tenn.2002).

▆ This court must conclude in this case, as well, that the record does not support the argument that the court kept

excessively late night hours. In support of its decision to extend the court day beyond eight hours, the trial court explained that this case was a capital murder case that had received extensive media attention. As a result, the court had gone outside of the county to secure a jury, and the jury was required to be sequestered and "locked away from family, friends and employment until the conclusion of the trial." We do not find that the trial court abused its discretion in extending the court hours in this case beyond eight hours per day. Defendant is not entitled to relief on this issue.

**8. [Deleted: Recusal]**

**9. Testimony of Joe Ingle**

▆ At Defendant's competency hearing, Defendant called Reverend Joe Ingle as a witness. Reverend Ingle has served as Defendant's pastor since June 1997, the month he was arrested. The trial court ruled that Reverend Ingle could not testify as to his conversations with Defendant because Defendant had not waived his priest-parishioner privilege. The court allowed Reverend Ingle to testify as to his general impressions of Defendant. Defendant asserts that the trial court erred in limiting Reverend Ingle's testimony. Specifically, Defendant contends that because he was incompetent, and should have been presumed incompetent by the trial court, he was also incompetent to assert the priest-parishioner privilege. Accordingly, Reverend Ingle's testimony should not have been limited.

In the appeal of his Montgomery County convictions, Defendant argued that the trial court erred in excluding the testimony of Reverend Ingle. Our Supreme Court rejected Defendant's arguments as follows:

In our view, the trial court did not err in excluding the testimony. First, our conclusion that a defendant bears the bur-

den of establishing his or her incompetency necessarily means that he or she has not been found to be incompetent before or during the competency proceeding itself. As a result, nothing prevents a defendant from invoking an applicable privilege during a competency proceeding as a matter of law. Moreover, the trial court is free to reconsider the issue of the defendant's invocation of privileges while evidence of the defendant's mental status is presented during the hearing by both the defense and prosecution.

Second, a defendant's right to present evidence to meet the burden of proof does not eliminate the trial court's discretion in determining relevance and materiality of the evidence. Here, the defendant presented extensive expert testimony to show that he was not competent to stand trial. The expert witnesses related the basis of their opinions, which included analysis of the defendant's family background, history of head injuries, and mental illness. . . . In sum, the defendant's exercise of his privileges did not prevent the trial court from fully considering the material evidence and making a thorough assessment of the relevant issues pertaining to the defendant's competency to stand trial. Accordingly, we conclude that the trial court did not err in excluding the testimony of the witnesses.

*State v. Reid,* 164 S.W.3d at 309. After a review of the evidence in this case, and based upon the above-quoted rationale of the Supreme Court, we conclude that the trial court did not err in limiting the testimony of Reverend Ingle. Defendant is not entitled to relief on this issue.

## 10. Testimony of Maureen McGinley

 Defendant sought to introduce the testimony of Maureen McGinley at the competency hearing. Ms. McGinley served as Defendant's jury consultant during the Captain D's murder trial in April 1999. Ms. McGinley had not had any contact with Defendant following that trial. Yet, Defendant wanted to elicit testimony from her regarding his actions during April 1999 to buttress his contention that he was incompetent to stand trial in this case.

 As this court has explained, a hearing to determine if a defendant is competent to stand trial does not focus on the defendant's guilt or innocence or even the defendant's mental condition at the time of the crime. Instead, a competency hearing is "a very narrow inquiry aimed at determining whether one who is charged with a criminal offense is presently competent to stand trial." *State v. Stacy,* 556 S.W.2d 552, 553 (Tenn.Crim.App.1977). The testimony of Maureen McGinley as to Defendant's conduct during his April 1999 trial has not been shown to be relevant to the issue of Defendant's competency at the time of the hearing in this case. Moreover, a memorandum authored by Ms. McGinley was admitted into the record and considered by the trial court. The memorandum set forth Defendant's behavior during his April 1999 trial. Defendant is not entitled to relief on this issue.

## 11. Testimony of Carla Crocker

 Defendant also contends that the trial court erred in excluding the testimony of Carla Crocker, the Public Affairs Officer for the Davidson County Sheriff's Office, from his competency hearing. Ms. Crocker would have testified that in March 1999, Defendant attempted to call a press conference in which he intended to discuss a dispute with the sheriff's office involving an allegation that a chicken bone had been found in his cell. In excluding Ms. Crocker's testimony, the court concluded that (1)

the event was too remote in time and was therefore not relevant and (2) the court had prevented the press conference by issuing a gag order. Defendant admitted that Ms. Crocker had not had any contact with Defendant since the incident in March 1999.

We conclude that Ms. Crocker's testimony was not relevant to Defendant's current competency. *See* Tenn. R. Evid. 401. We cannot determine that the trial court erred in excluding the testimony of Carla Crocker. Defendant is not entitled to relief on this issue.

## 12. Denial of funds for evaluation of Defendant by Dr. Xavier Amador

█ As has been previously discussed, during the competency proceedings Defendant moved to have Dr. Xavier Amador testify on Defendant's behalf. The court denied the request. The court had previously approved funds for Dr. Amador to evaluate Defendant's competency, but the court rescinded its previous ruling. The court explained that it had previously approved funds in the abstract for Dr. Amador, to keep a monitor on Defendant's condition, but the monitoring had not occurred. Dr. Amador had not seen Defendant in six months. Defendant had been evaluated by a defense expert, would be evaluated by an expert on behalf of the State, and would be evaluated by an independent expert. Accordingly, the court determined that there was no reason to have Dr. Amador evaluate Defendant currently. The court further explained that time was of the essence. The court also noted that Supreme Court Rule 13 did not permit it to hire a second expert, especially an out-of-state expert.

Defendant argues that the trial court's ruling "might have made sense" if the court had rendered a decision on the testimony of Dr. Auble, Dr. Martell, and Dr. Caruso. However, Defendant asserts that once the court secured a second independent evaluation of Defendant, the court was obligated to provide funds to enable Dr. Amador, who had extensive experience with Defendant, to perform an evaluation. Defendant cites to no case law to support his assertion that the court was obligated to provide funds for Dr. Amador once the court sought a second independent evaluation. Defendant further contends that the trial court's ruling constitutes a denial of his right to call witnesses on his own behalf, as well as his rights to due process and a fair trial.

█ Defendant's assertions are not supported by statute or case law. Tennessee Code Annotated Section 40–14–207 provides that in capital cases where a defendant has been found indigent, the court may, in its discretion, determine that expert services are necessary to ensure that the constitutional rights of the defendant are protected. The Supreme Court has analyzed section 40–14–207 of the Tennessee Code and has held that it does not entitle a defendant to an expert of his choice. Rather, an indigent defendant must be provided with the tools necessary to present an adequate defense. *State v. Smith,* 857 S.W.2d 1, 12 (Tenn.1993). The court provided funds for Defendant to obtain the services of Dr. Pamela Auble. Dr. Auble, unlike Dr. Amador, had maintained a continuous relationship with Defendant. Moreover, Dr. Amador's practice was in New York, and Defendant did not demonstrate the need for an out-of-state expert as contemplated by Supreme Court Rule 13.

Based on the foregoing, we conclude Defendant is not entitled to relief on this issue.

### 13. Denial of continuance of competency hearing

As has been previously set forth, Defendant contends that the trial court erred in denying his request to defer the testimony of state expert Dr. Daniel Martell until such time as he had prepared his written report and defense counsel had the opportunity to review the report with the aid of their experts. Specifically, Defendant asserts that he was given insufficient time to prepare for the cross-examination of Dr. Martell. The circumstances surrounding Dr. Martell's evaluation and testimony are as follows. Dr. Martell, who lives in California, arrived in Nashville on March 14, 2000, and evaluated Defendant and his competency to stand trial that night. Dr. Martell had actually traveled to Nashville to participate in a deposition in an unrelated capital case. The trial court contacted the federal judge who was supervising the other matter and requested that the State be permitted to "borrow" Dr. Martell so he could present testimony in this case during a lunch break. Dr. Martell did not have time to prepare a written report of his findings prior to his testimony. As a result, defense counsel requested that Dr. Martell's testimony be deferred until he could prepare a written report and counsel had been given adequate time to review the report with the aid of experts. The trial court refused to delay Dr. Martell's testimony. In denying Defendant's request, the court noted that exigent circumstances existed due to the filing of the competency motion so close in time to the selection of the jury. The court acknowledged that the defense did not have much time to prepare for Dr. Martell's testimony, but stated that the State did not have much time to prepare either.

Defendant asserts that his counsel was not given an opportunity to investigate the evidence provided by Dr. Martell prior to its admission. Defendant notes that to provide effective representation, counsel must conduct appropriate factual and legal investigations. *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn.2002); *Baxter v. Rose*, 523 S.W.2d 930, 932, 935 (Tenn.1975). While counsel was not provided with Dr. Martell's report prior to his testimony, counsel received Dr. Martell's notes from the evaluation and met with Dr. Martell about his findings. Further, Defendant has not demonstrated any harm resulting from the court's ruling on this issue. Given the unique circumstances surrounding Dr. Martell's evaluation and testimony, we determine that the trial court did not abuse its discretion in denying a continuance of the competency hearing.

### 14. Testimony of Dr. Daniel Martell as expert in the field of psychology

Defendant contends that the trial court erred in allowing Dr. Martell to testify as an expert in the field of forensic neuropsychology because he is not licensed to practice psychology in the State of Tennessee. During cross-examination, defense counsel asked Dr. Martell if he had evaluated Defendant with regard to the issue of competency as a psychologist. Dr. Martell responded that he had. The trial court concluded, however, that Dr. Martell had performed a forensic evaluation of Defendant's competence and had not engaged in the practice of psychology as defined by Tennessee Code Annotated Section 63–11–211(b)(5).

The Supreme Court addressed the same issue in *Coe v. State*, 17 S.W.3d 193 (Tenn. 2000). The Supreme Court determined in that case that Dr. Martell had performed a forensic evaluation, which did not constitute the practice of psychology under Tennessee Code Annotated Section 63–11–

203(a) and therefore no authorization was required by Tennessee Code Annotated Section 63–11–211(b)(5). *Id.* at 224–25. In reaching its decision, the Supreme Court explained that the only purpose of Dr. Martell's evaluation was to determine whether Coe was competent. Dr. Martell's evaluation "was not for the purpose of 'preventing or eliminating' any psychological illness of [Coe] and 'enhancing' his mental health. Therefore, the performance of the forensic evaluation did not constitute the practice of psychology." *Id.* at 225. The same is true in this case. Although Dr. Martell testified that his examination of Defendant was "the practice of psychology," the purpose of Dr. Martell's examination of Defendant was to determine his competency to stand trial. The examination was not for the purpose of preventing or eliminating any psychological illness of Defendant and enhancing his mental health. *See* Tenn.Code Ann. § 63–11–203(a) defining the "practice of psychologist." Accordingly, Dr. Martell's evaluation did not constitute the practice of psychology. The trial court did not err in allowing Dr. Martell to testify as an expert witness. Defendant is not entitled to relief on this issue.

**15. Second court-ordered evaluation of defendant and monitoring by Dr. Farooque**

Following testimony by Defendant's expert, the State's expert, and the court-appointed mental health expert at the competency hearing, the court ordered a second evaluation of Defendant. The court found the testimony of the three experts to be conflicting and determined that a second evaluation of Defendant by a court-appointed expert was necessary. The court based its reasoning in part on the fact that it questioned the credibility of Dr. Caruso, the independent expert it had previously appointed.

Dr. Caruso's written report stated that he had to remind Defendant during his evaluation that the insanity defense was available to him. However, Defendant was being evaluated for the purposes of competency to stand trial, not insanity at the time of the crimes. Following his testimony, Dr. Caruso sent a fax to the court explaining that he may have unintentionally misstated Defendant's knowledge of his charges in his report and in his testimony before the court. The court found that Dr. Caruso's report lacked credibility due to the fact that his finding that Defendant was unaware of the charges against him could not be verified by the tape recordings Dr. Caruso made, as the tape recorder had malfunctioned during that portion of the interview. Additionally, the court questioned Dr. Caruso's credibility because he submitted a bill to the court in an amount of $20,250 for his evaluation of Defendant, when he had agreed to accept a fee of $7,500.

Tennessee Code Annotated Section 33–7–301 sets forth the procedure a court must undertake in appointing a competency expert. The Code, however, sets forth no procedure for the court to follow when it questions the credibility of the expert it has appointed under the Code. It is quite obvious that the court questioned the credibility of the expert it had appointed. Defendant asserts that because Tennessee Code Annotated Section 33–7–301 does not specifically provide that the court may order a second evaluation, the court erred in doing so. However, we cannot agree.

Given the circumstances of this case, we find it was within the trial court's discretion to order a second evaluation. Defendant surmises that the court ordered the second evaluation because the court did not approve of the opinion given by Dr. Caruso. However, the court explained

that it had absolutely no interest in trying any incompetent defendant, especially one whose life was at stake. The court, however, felt it was necessary for Defendant to undergo a second evaluation, given the conflicting testimony by the three experts. Moreover, Dr. Caruso had opined that although he believed Defendant was currently incompetent, he may become competent with the use of medication. Therefore, the court instructed that the second evaluation include recommendations regarding the need for medication. Given these circumstances and the fact that the court questioned the credibility and accuracy of the court-appointed expert, the court did not err in ordering a second evaluation of Defendant.

Similarly, Defendant argues that the trial court erred in designating Dr. Rokeya Farooque to monitor Defendant's competency following the competency hearing. Defendant submits that the trial court had no legal authority to appoint an independent evaluator after it appointed Dr. Caruso. However, as set forth above, given the circumstances of this case, we find no error in the continued monitoring of Defendant by Dr. Farooque and the MTMHI forensic staff. As the trial court explained in its order denying Defendant's motion for new trial, the court had not had any discussions with Dr. Caruso concerning continued monitoring of Defendant following the competency hearing. Although Dr. Caruso had agreed to evaluate Defendant for a fee of $7,500, he sent a request for payment on the amount of $20,250. As a result, the trial court determined that it should not employ a private psychiatrist when a qualified forensic team from a state hospital was available. Defendant has failed to set forth any prejudice that resulted from the trial court's order that Dr. Farooque monitor Defendant's competence throughout trial.

Defendant is not entitled to relief on this issue.

### 16. Rebuttal testimony of Dr. Caruso

Defendant submits that the trial court erred in refusing to allow Dr. Caruso to offer rebuttal testimony following the testimony by the evaluation team as to its evaluation of Defendant. However, the court allowed Dr. Auble, Defendant's designated expert, to testify on rebuttal. Moreover, the court had stated in open court and through its written orders that it questioned the credibility and accuracy of Dr. Caruso and his findings.

The issue of whether to allow rebuttal testimony, as well as the scope of that testimony, lies within the sound discretion of the trial court. *State v. Thompson*, 43 S.W.3d 516 (Tenn.Crim.App.2000). The court's ruling on this issue will not be overturned absent a clear abuse of discretion. *State v. Kendricks*, 947 S.W.2d 875, 884 (Tenn.Crim.App.1996). The trial court found that Defendant was not prejudiced by the court's refusal to allow the rebuttal testimony of Dr. Caruso, and Defendant has failed to show on appeal how he was prejudiced by the court's ruling that Dr. Caruso could not testify in rebuttal to the testimony of the evaluation team from MTMHI. After a review of the record, we cannot determine that the trial court abused its discretion in refusing to allow Dr. Caruso to testify on rebuttal at the competency hearing. Defendant is not entitled to relief on this issue.

### 17. [Deleted: Competency of Defendant to stand trial]

### 18. Defense counsel's motion to withdraw

Following the competency hearing, defense counsel moved for withdrawal of fur-

ther representation of Defendant. Defense counsel asserted that they could not effectively represent Defendant because he did not trust them and believed that they were trying to kill him. The trial court denied the motion. The trial court noted that Defendant's main complaint with his attorneys was that they had focused too much time on the competency and penalty phases, rather than the guilt phase. The court determined that any attorneys in their stead would pursue the same strategy. The court also noted that it was not uncommon for defendants to disagree and be dissatisfied with their attorneys. The court pointed out that Defendant's attorneys were very well acquainted with the facts of the case and Defendant's mental health and family history. Accordingly, the court found that Defendant's current attorneys were uniquely qualified to represent Defendant in this capital murder trial. The court determined that the replacement of Defendant's attorneys was not warranted and denied the motion.

■ Tennessee Code Annotated Section 40–14–205 provides that the court may allow an appointed attorney to withdraw upon good cause shown. The trial court's decision on withdrawal in a pending criminal matter rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *State v. Branam,* 855 S.W.2d 563, 566 (Tenn.1993); *State v. Russell,* 10 S.W.3d 270, 274 (Tenn.Crim.App.1999). At the time of Defendant's trial, Tennessee's Code of Professional Responsibility was in effect. *See* Tenn. S.Ct. R. 8 (2000). Under the Code of Professional Responsibility, mandatory withdrawal of an attorney from representation is required when:

(1) The lawyer knows or it is obvious that the client is bringing the legal action, conducting the defense, or assert-

ing a position in the litigation, or is otherwise having steps taken for the client, merely for the purpose of harassing or maliciously injuring any person.

(2) The lawyer knows or it is obvious that continued employment will result in violation of a Disciplinary Rule.

(3) The lawyer's mental or physical condition renders it unreasonably difficult for the lawyer to carry out the employment effectively.

(4) The lawyer is discharged by his client.

Tenn. S.Ct. R. 8, DR 2–110(B). None of the instances requiring mandatory withdrawal is present in this case. Accordingly, mandatory withdrawal was not required. Defendant asserts, however, that permissive withdrawal was warranted by DR 2–110(C)(1)(d), which provides that counsel may request withdrawal because the client "[b]y other conduct renders it unreasonably difficult for the lawyer to carry out the employment effectively." Tenn. S.Ct. R. 8, DR 2–110(C)(1)(d). On appeal, Defendant contends that his relationship with his attorneys was compromised to a degree that made counsel's effective representation of him impossible. As a result, Defendant contends that the trial court erred in denying counsel's motion to withdraw. We conclude, however, that the trial court did not err in denying counsel's motion to withdraw, given the circumstances of this case.

■ In this case, the court found that counsel were uniquely qualified to represent Defendant. The Tennessee Supreme Court has stated that "[t]he advantage of familiarity with [a] case will generally outweigh any possible advantages to be gained in the fresh viewpoint of successor counsel." *Parton v. State,* 2 Tenn.Crim. App. 626, 455 S.W.2d 645, 650 (1970). Defense counsel's motion to withdraw was made with two weeks remaining until jury

selection was set to begin. Defendant would have been adversely affected if the court had allowed withdrawal of counsel at such a late date. Moreover, as the trial court noted, the appointment of new counsel would not have resolved the issues Defendant had with his attorneys concerning what he believed was his best trial strategy.

We further note that subsequent to Defendant's trial, Tennessee adopted the Rules of Professional Conduct. *See* Tenn. S.Ct. R. 8, RPC (2003). Under the Rules of Professional Conduct, withdrawal of representation by counsel is mandatory where continued representation will result in a violation of the Rules of Professional Conduct or other law, where counsel's physical or mental condition materially affects his ability to represent the client, or where counsel is discharged by the client. Tenn. S.Ct. R. 8, RPC 1.16. Further, counsel may withdraw from representation of a client if the withdrawal can be accomplished without material adverse effect on the interests of the client, or if: the client persists in a course of action that the lawyer reasonably believes is criminal or fraudulent; the client uses the lawyer's services to perpetrate a crime or fraud; the client insists upon pursuing an objective that the lawyer considers repugnant or imprudent; the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and the client has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled; the representation will result in an unanticipated and substantial financial burden on the lawyer or has been rendered unreasonably difficult by the client; other good cause for withdrawal exists; or the client agrees to the withdrawal of the lawyer in writing. *Id.* The Rules of Professional Conduct were not in effect until March 1, 2003, and thus were not applicable at the time of Defendant's trial. However, we determine that even if this case were remanded for a new trial and tried under the new Rules of Professional Conduct, mandatory withdrawal would not be required, given the same set of circumstances. Moreover, permissive withdrawal of defense counsel in this instance would have resulted in a material adverse effect on the interests of Defendant. Accordingly, assuming *arguendo* that it was error on the part of the trial court to deny counsel's motion to withdraw, such error would be harmless in light of the new Rules of Professional Conduct. A new trial would not give Defendant any benefit. As the trial court noted, appointment of new counsel would not have resolved the issues Defendant had with defense counsel. As a result of the foregoing, the trial court did not abuse its discretion in denying defense counsel's motion to withdraw.

### 19. "Religious tests" in voir dire

Defendant contends that the exclusion of jurors who express religious objections to the death penalty constitutes a religious test, which is prohibited by Article I, Section 6 of the Tennessee Constitution. Defendant filed a motion to prohibit the use of this "religious test," which the trial court denied. Defendant acknowledges that the Tennessee Supreme Court has held that the exclusion of jurors who express religious objections to the death penalty is not a religious test, per se, citing *State v. Jones,* 789 S.W.2d 545, 547 (Tenn. 1990).

Moreover, the Supreme Court affirmed this court's holding in defendant's prior appeal of the Captain D's murders in *State v. Reid,* that the exclusion of prospective jurors by a trial court because of their moral or religious based reluctance to im-

pose the death penalty is not error. *State v. Reid*, 91 S.W.3d 247, 289–90 (Tenn. 2002). "In this regard, potential jurors are removed for cause not because of their religious opinion or affiliation but because the jurors are unable to view the proceedings impartially and perform their duties in accordance with the juror's oath." *Id.* at 290. Questioning of a juror with regard to the death penalty does not amount to a religious test. *Id.* (citing *Wolf v. Sundquist*, 955 S.W.2d 626, 631 (Tenn.App.), *perm. app. denied*, (Tenn.1997)). Defendant acknowledges that the Tennessee Supreme Court has rejected this argument, but makes the argument in order to preserve it for later review. *See State v. Gomez*, 163 S.W.3d 632, 651 (Tenn.2005) ("Indeed, a defendant is never precluded from raising an issue simply because a prior decision has rejected it."). Defendant is not entitled to relief on this issue.

## 20. Instruction to venire that some aggravating factors relate to circumstances of the victim

Defendant contends that the trial court erred when it stated to the first panel of potential jurors, in giving general instructions about the nature of a capital case, that aggravating circumstances are specifically defined by the legislature and "relate to circumstances about the crime or circumstances about the victim." Defendant asserts that this statement could have misled the jury into believing that victim impact evidence constituted an aggravating circumstance. Defendant admits that several of the aggravating circumstances relate to circumstances of the victim. However, Defendant submits that the court must state the law fully and accurately, and this statement by the court may have misled the jury. Defendant further admits that the trial court later properly instruct-

ed the jury that victim impact evidence is not the same thing as an aggravating circumstance. However, Defendant submits that the proper instruction only served to heighten the jury's confusion.

Defendant failed to enter a contemporaneous objection to the trial court's statement; therefore, this issue is waived for purposes of appeal. Tenn. R.App. P. 36(a). Moreover, in the same general instruction to the panel of potential jurors, the trial court instructed the jury that they must rely on the aggravating circumstances delineated by the legislature, that they could not make up their own aggravating circumstances, that the court would tell them what the potential aggravating circumstances were, that they would have to unanimously agree that the aggravating circumstances existed, and they would have to agree that the aggravating circumstances existed beyond a reasonable doubt. This court cannot determine that the trial court's statement misled the jury. Defendant is not entitled to relief on this issue.

## 21. Questioning of potential juror regarding her opinion of mental health as mitigation evidence in the case of *State v. Coe*

Defendant next contends that the trial court erred in refusing to allow questioning of a potential juror on her opinion as to whether she believed it was proper for the attorneys who had represented capital defendant Robert Glen Coe to claim that he was mentally incompetent as a defense to his impending execution. In response to the question, the potential juror responded: "I didn't think anything about that because I didn't know anything about that." The State then objected to further questioning on the grounds of relevancy. The court sustained the objection.

Defendant contends that as a result of the court's limitation on questioning of the potential juror, Defendant was not able to conduct the voir dire in such a manner that would enable him to determine if a potential juror would consider, in good faith, the mitigating circumstance of mental health. However, the court did not limit counsel's ability to question the potential juror on whether she would consider mental health as a mitigating circumstance. Instead, the court refused to allow questioning of the juror on a subject about which the juror had advised she had no knowledge. The court's limitation on defense counsel's questioning of the juror about her knowledge and opinion of the *Coe* case did not impede Defendant's ability to determine if the potential juror would consider, in good faith, the mitigating circumstance of mental health.

 The control of voir dire proceedings rests within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record. *State v. Howell,* 868 S.W.2d 238, 247 (Tenn.1993), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). Defendant has failed to demonstrate an abuse of discretion by the trial court on this issue, and therefore is not entitled to relief on this issue.

## 22. Failure to excuse juror Judy Reynolds for cause

 Defendant asserts that the trial court should have excluded juror Judy Reynolds for cause. In response to the juror questionnaire, Ms. Reynolds stated that she strongly favored the death penalty and that she would have difficulty in imposing a sentence of life or life without the possibility of parole in a murder case. Ms. Reynolds explained that if a person was in his right mind and knew what he was doing, then she would be in favor of imposing the death penalty. However, she also explained that she would listen to the facts of the case, and if the aggravating factors did not outweigh the mitigating factors, she could consider both the sentences of life and life without the possibility of parole. She further explained that she could follow the law and her oath as a juror.

Defense counsel also asked Ms. Reynolds about her views on the death penalty, and she again explained that she was in favor of the death penalty. However, upon further questioning by defense counsel, Ms. Reynolds stated that she would consider mitigating factors in making a decision on the appropriate sentence and would consider the sentences of life and life without the possibility of parole. In response to questioning by the State, Ms. Reynolds again confirmed that she would listen to all of the evidence, weigh both aggravating and mitigating circumstances, and consider sentences of life and life without the possibility of parole. Defense counsel did not challenge juror Reynolds immediately following her individual voir dire. However, the defense did later challenge Ms. Reynolds. At that time, the trial court denied the challenge for cause. The trial court ruled that Ms. Reynolds could follow her oath as a juror and determined that Ms. Reynolds would be an appropriate juror for the case.

 In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *State v. Austin,* 87 S.W.3d 447, 472–73 (Tenn.2002) (citing *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct.

844, 83 L.Ed.2d 841 (1985)). "[T]his standard likewise does not require that a juror's biases be proved with 'unmistakable clarity.'" *Id.* at 473. However, the trial judge must have the "definite impression" that a prospective juror could not follow the law. *State v. Hutchison,* 898 S.W.2d 161, 167 (Tenn.1994) (citing *Wainwright v. Witt,* 469 U.S. at 425–26, 105 S.Ct. at 853). Finally, the trial court's finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the defendant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. *State v. Alley,* 776 S.W.2d 506, 518 (Tenn.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990).

After reviewing the answers and responses of Judy Reynolds, we conclude that the trial court did not err in failing to exclude her for cause. Ms. Reynolds was extensively questioned as to whether she could apply the law to the evidence and consider all forms of punishment in this case. She responded that she would be able to do so. Defendant is not entitled to relief on this issue.

**23. Questioning of prospective jurors as to whether they believed the death penalty is a "moral function" of the government**

During voir dire, the State asked potential jurors if they believed the death penalty was an "appropriate and moral function of the government in certain first degree murder cases as set out by law." Defendant contends that the trial court erred in allowing this question to be asked because the question implies that a juror who will not return a death sentence is immoral. However, Defendant did not object to this question. Accordingly, Defendant has waived appellate consideration of this issue. *See State v. Thornton,* 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn. R.App. P. 36(a)); *State v. Green,* 947 S.W.2d 186, 188 (Tenn.Crim.App.1997). Moreover, the scope and extent of voir dire is entrusted to the discretion of the trial court, and a trial court's rulings will not be reversed on appeal absent an abuse of discretion. *State v. Smith,* 993 S.W.2d 6, 28 (Tenn.1999). Defendant has failed to show an abuse of discretion by the trial court; therefore, he is not entitled to relief on this issue.

**24. Questioning of prospective jurors regarding what they had learned about eyewitness identification from watching television**

During the group voir dire in this case, defense counsel attempted to ask a member of the panel what he had learned about eyewitness identification from watching television shows. The defense had included a similar question on the juror questionnaire. The State objected to the question during voir dire, and the court sustained the objection. In making its ruling, the court explained that the question was irrelevant to the potential juror's qualification to sit on the jury. The court further explained that the defense's question could elicit responses that would taint the entire panel. The trial court noted in its order denying the motion for new trial that "[t]he relevant inquiry was whether, regardless of each juror's personal knowledge concerning [eyewitness identification] evidence, he or she could objectively listen to and evaluate it during this trial."

Rule 24(a) of the Tennessee Rules of Criminal Procedure provides that the trial court "shall permit questioning by the parties for the purposes of discovering bases

for challenge for cause and enabling an intelligent exercise of peremptory challenges." As previously set forth, however, the scope and extent of voir dire is entrusted to the discretion of the trial court, and a trial court's rulings will not be reversed on appeal absent an abuse of discretion. *Smith,* 993 S.W.2d at 28.

The trial court allowed the defense to inquire about the potential jurors' knowledge of eyewitness identification on the questionnaire. Moreover, the court allowed counsel to ask potential jurors if they had learned anything outside of the courtroom that would affect their ability to consider eyewitness testimony fairly and impartially. Defense counsel also asked the panel numerous questions on the issue of eyewitness identification. Defendant asserts that by asking the potential juror what he had learned through watching television shows, counsel was merely attempting to make sure that the juror had not viewed programs that depicted eyewitness identifications as infallible or immune from error. After a review of the voir dire, we conclude that defense counsel was not restricted from asking about whether potential jurors believed or had learned from an outside source that identifications are infallible or immune from error. In fact, defense counsel announced to the panel that she wanted to ask a general question, which she stated as follows: "Is there anybody here who believes that people never make mistakes in recognizing other people? Is there anybody here who believes that?" No one from the panel responded affirmatively. The trial court's refusal to allow questioning of a potential juror as to his viewing of a television show that included the subject of eyewitness identification was not error. Defendant has failed to show that the trial court

erred in this ruling, and is therefore not entitled to relief on this issue.

## 25. Questioning of witness Jose Gonzales regarding the color of the perpetrator's gun

Witness Jose Gonzales required the use of an interpreter at trial. Mr. Gonzales, a Spanish speaking native of Mexico, was assisted by an interpreter from Puerto Rico. During the State's case-in-chief, the prosecutor questioned Gonzales about the color of the gun used during the homicides. Gonzales, through his interpreter, responded that the gun was a "gold-type color." The prosecutor asked two follow up questions, inquiring as to whether the gun was shiny like gold or had a gold tint. Each time, Gonzales responded that it was a gold or gold-like color. The prosecutor subsequently asked the interpreter to ask Gonzales to describe the difference in silver and gold. At that point, the defense objected, arguing that the question of the color of the gun had been asked and answered. The prosecutor explained that he believed there might be a problem in the translation between the Mexican witness and the Puerto Rican interpreter. The prosecutor stated he wanted to ask one clarifying question. The judge then allowed the following question: "Could you ask, the question is, what is silver in Mexico; what is silver in Mexico versus gold in Mexico?" Gonzales responded: "I call silver a gold color."

Defendant contends that the issue of the color of the gun was crucial because witness Robert Bolin testified that the gun he had sold to Defendant was "nickel-plated." Defendant asserts that Gonzales did not refer to the color silver until the State suggested the proper answer in its question. Accordingly, Defendant contends that the trial court erred in allowing the

repetitive questioning regarding the color of the gun.

It is the longstanding principle that the "propriety, scope, manner and control of examination of witnesses is within the trial court's discretion and will not be interfered with in the absence of an abuse of discretion." *State v. Harris,* 839 S.W.2d 54, 72 (Tenn.1992). In the order denying the motion for new trial, the trial court explained that Gonzales had previously expressed concern that his thoughts were not being accurately conveyed at times due to variations among the dialects of his Spanish speaking interpreters. Moreover, this court cannot conclude that the trial court's allowance of a clarifying question results in prejudicial error, especially in light of the fact that the defense fully cross-examined Gonzales and highlighted his previous testimony that the color of the gun was a golden color. Defendant has failed to show an abuse of discretion by the trial court. Defendant is not entitled to relief on this issue.

### 26. Admission of photograph of defendant

Exhibit 2 to Defendant's trial is a photograph of Defendant standing in front of a black automobile. In the photograph, Defendant is wearing a pair of black tennis shoes. Witness Jose Gonzales testified that the shoes worn by Defendant in the photograph were similar to the shoes he wore on the night of the robbery and murders at McDonald's. The photograph was admitted over the objection of the defense. Specifically, the defense contended at trial and contends on appeal that the photograph should not have been admitted into evidence because the photograph does not clearly depict a pair of shoes, and the admission of the photograph was, therefore, error. Defendant further argues that

the photograph should have been excluded pursuant to Tennessee Rule of Evidence 403, which reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Defendant argues that the photograph at issue is not admissible because it does not clearly depict a pair of shoes, and that, even if it did, there was no way that Gonzales could state with certainty that the shoes in the photograph were the same shoes worn by the perpetrator.

It is within a trial court's discretion to admit photographic evidence at trial, and this court will not reverse the trial court's determination absent an abuse of discretion. *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978). However, before a photograph may be admitted into evidence, the relevance of the photograph must be established, and the probative value of the photograph must outweigh any prejudicial effect. *State v. Braden,* 867 S.W.2d 750, 758 (Tenn.Crim.App.1993). We conclude that the photograph was relevant to the description of Defendant on the night in question, and we further determine that the admission of the photograph was not outweighed by any prejudicial effect. The photograph at issue is a clear depiction of Defendant wearing a pair of black tennis shoes. We cannot determine that the trial court erred in allowing the admission of the photograph. Defendant has failed to show that the photograph was not relevant to Gonzales' description of Defendant or that the admission of the photograph was error under Rule 403. Defendant is not entitled to relief on this issue.

### 27. Impeachment of witness Gonzales with transcript of preliminary hearing

Defendant contends that the trial court committed reversible error when it denied defense counsel's request to impeach Gonzales with his testimony at the preliminary hearing. At the preliminary hearing, Gonzales testified that Defendant's hair was black and it came out of the baseball cap he was wearing on both the sides of the cap and in the back. During Gonzales' cross-examination at trial, he testified that the man at the restaurant on the night in question had hair coming out of the sides of the baseball cap. He further testified that he did not recall having said that the perpetrator's hair extended from the back of the cap and that as he recalled, the hair was only coming out from the sides of the cap. The defense, however, had Gonzales view the composite sketch, and Gonzales admitted that he had assisted the police in the formulation of the sketch. Gonzales admitted that the man pictured in the sketch had hair coming out of the back of the baseball cap. Moreover, defense counsel asked: "But you did see hair coming out of the back of the head," and Gonzales responded: "Yes, coming out of the baseball cap." Thereafter, the defense requested that it be permitted to cross-examine Gonzales with his testimony at the preliminary hearing. The defense specifically requested that it be permitted to show the transcript to Gonzales to show him exactly what his testimony had been at the preliminary hearing. The trial court denied the request.

In denying defense counsel's request, the court explained that the transcript was produced in English, and it had not been established that Gonzales could read English. Moreover, there was not a verbatim transcription of Gonzales' words at the preliminary hearing. Instead, there was a transcription of the interpreter's translation of what Gonzales said.

The propriety, scope, manner and control of cross-examination of witnesses lies within the discretion of the trial court. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn.Crim.App.1995) (citing *Coffee v. State*, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948); *Davis v. State*, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948)). This court will not disturb the limits placed upon the cross-examination by the trial court, unless the trial court has unreasonably restricted the right. *Id.* (citing *State v. Fowler*, 213 Tenn. 239, 253, 373 S.W.2d 460, 466 (1963); *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn.Crim.App.1984)). We cannot conclude that the trial court unreasonably restricted the cross-examination of Gonzales when it denied the defense's request to impeach him with his testimony at the preliminary hearing. As the trial court noted, there was no proof that the witness would have been able to read the English transcript to either confirm or deny that he made the statement as set forth in the transcript. Moreover, Gonzales admitted during cross-examination by the defense that the composite sketch depicted the perpetrator with hair coming out of the back of the baseball cap. He also admitted that he saw hair coming out of "the back of the head." Defendant has failed to show that he was prejudiced by the court's denial of cross-examination of Gonzales with the use of the preliminary hearing testimony. Defendant is not entitled to relief on this issue.

### 28. Re-cross Examination of witness Gonzales

On redirect examination of witness Gonzales, the State questioned Gonzales about the length of Defendant's hair on the night of the murders as opposed to the length of

his hair the first time he saw Defendant in court after his arrest. During re-cross by the defense, counsel attempted to introduce a photograph of Defendant for the purpose of asking if Defendant's hair in the photograph is different from the hair of the man Gonzales encountered at McDonald's on the night of the robbery and murders. The trial court denied Defendant's request to cross-examine Gonzales with the photograph. The trial court ruled that such questioning of Gonzales was not proper for re-cross examination. The court further advised that counsel could have introduced the photograph during its cross-examination of Gonzales. The trial court explained that the prosecutor's redirect examination of Gonzales regarding the length of Defendant's hair on the night in question and in court did not open the door for the questioning and introduction of the photograph as proposed by defense counsel.

As set forth *supra* the propriety, scope, manner and control of cross-examination of witnesses lies within the discretion of the trial court, and this court will not disturb the limits placed upon the cross-examination, unless the trial court has unreasonably restricted the right. *State v. Dishman,* 915 S.W.2d at 463. Defendant has not shown how he was prejudiced by the trial court's ruling on this issue. Further, after a review of the record before us, we cannot conclude that the trial court committed reversible error in its refusal to allow the questioning and introduction of the photograph as requested by Defendant. Defendant is not entitled to relief on this issue.

## 29. Crime scene video

Defendant contends that the trial court erred in admitting into evidence the videotape of the crime scene. Defendant contends that the videotape was cumulative of testimony of other witnesses. Specifically, defendant contends that the videotape was not necessary to establish the position of the bodies or the description of the crime scene. Defendant further contends that the depiction of the crime scene in the videotape was "gruesome and graphic" and thus prejudicial. Defendant submits that the only purpose of the video was to inflame and prejudice the jury against him.

The admissibility of a videotape of a crime scene is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. *State v. Carruthers,* 35 S.W.3d [516] at 576–57 [ (Tenn. 2000) ], *cert. denied,* 533 U.S. 953, 121 S.Ct. 2600, 150 L.Ed.2d 757 (2001); *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978); *see also State v. Van Tran,* 864 S.W.2d 465, 477 (Tenn.1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994). As the Supreme Court stated in *Carruthers,* the modern trend is to vest more discretion in the trial judge's rulings on admissibility. *Carruthers,* 35 S.W.3d at 577 (citing *State v. Banks,* 564 S.W.2d at 949; *State v. Bailey,* No. 01C01–9403–CC–00105, 1995 WL 424996 (Tenn.Crim.App., Nashville, July 20, 1995); *perm. app. denied,* (Tenn. Jan. 8, 1996)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. *Carruthers,* 35 S.W.3d at 577 (citing *State v. Gentry,* 881

S.W.2d 1, 6 (Tenn.Crim.App.1993)). The court must still determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. *Id.* The term "undue prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks,* 564 S.W.2d at 950–51.

In *Banks,* the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence. A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut Defendant's contentions. *Banks,* 564 S.W.2d at 951. In this case, the trial court found that the video was relevant to show the position of the victims, to give an accurate description of the crime scene, to corroborate the testimony of Gonzales, to show the location of the victims' hats, to show the location of the shell casings, and to show intent. The court further found that the probative value of the videotape was not substantially outweighed by the danger of unfair prejudice. Defendant advances the argument that the video was graphic and gruesome, but the only contention he makes in this regard is that the video shows the bloody bodies of the victims as they were found at the crime scene and items left behind by medical personnel who rendered aid to Brown and Gonzales before transporting them to the hospital. The crime scene video of most homicides will necessarily depict the bodies of the victims as they were found and the blood of the victims. If this court were to accept defendant's argument in this regard, no crime scene videotapes of murders would ever be admissible.

This court further concludes that while the videotape and the other evidence admitted in this case may have contained some of the same material, it was not error to admit the videotape. *See State v. Bigbee,* 885 S.W.2d 797, 807 (Tenn.1994), holding that it was not error to admit a videotape of the crime scene although it depicted images similar to those of photographs also admitted. Each of the different forms of evidence admitted in this case served different purposes and were probative of the issues to be decided by the jury. As a result, the trial court did not abuse its discretion in admitting the videotape into evidence. *See id.; see also State v. Lee,* No. 02C01–9603–CC–00085, 1997 WL 686258, *9 (Tenn.Crim.App., Jackson, Nov. 5, 1997), *perm. app. denied,* (Tenn. Aug. 3, 1998). The probative value of the video of the crime scene is not outweighed by the danger of any unfair prejudice.

Defendant is not entitled to relief on this issue.

### 30. Photograph of crime scene

Defendant moved pretrial to exclude all still photographs of the crime scene. The court denied the motion, ruling that prior to the introduction of any photograph the State must give notice so that a hearing could be held outside the presence of the jury to determine admissibility. At trial, the court allowed the State to introduce a still photograph of the crime scene, which depicts blood at the scene and bloody footprints. Defendant contends that the admission of this photograph was error.

As set forth *supra,* it is within the trial court's discretion to admit photographic evidence at trial, and this court will not reverse the trial court's determination absent an abuse of discretion. *Banks,* 564

S.W.2d at 949. In its order denying the Defendant's motion for new trial, the court found that the photograph was not particularly gruesome, it assisted paramedic Randy Stratton with his testimony that the area where Jose Gonzales was found was small and there was virtually no way for paramedics to attempt to save Gonzales' life without contaminating the scene, it was relevant to the State's theory that unidentified bloody prints discovered at the scene were likely those of emergency personnel as opposed to the perpetrator, and its relevance was not substantially outweighed by the danger of unfair prejudice.

After a review of the record, we conclude that the trial court did not err in allowing the introduction of the photograph. While it depicts blood at the scene, we conclude that the photograph is not particularly gruesome. Moreover, we also agree that the photograph assisted witness Randy Stratton in his testimony. The probative value of the photograph is not substantially outweighed by the danger of unfair prejudice. Accordingly, Defendant is not entitled to relief on this issue.

### 31. Photographs of defendant with various hair lengths

During the testimony of Detective Postiglione, the State submitted for evidence a collection of photographs that depicted Defendant with various hair lengths. Defendant contends that the admission of the photographs was error because some of the photographs dated back to 1996 and, therefore, were not relevant to the time period at issue, spring and summer of 1997. Defendant further contends that the State offered proof that Defendant had altered the length of his hair during the relevant time period. Therefore, Defendant asserts that the admission of this cumulative evidence was irrelevant.

The trial court determined in its order denying the motion for new trial that the exact length of the Defendant's hair at the time in question was unknown. Therefore, through the photographs, the State "invited the jurors to observe the defendant's appearance with hair of various lengths and decide if his appearance could have been consistent with that of the perpetrator." The court specifically found that the probative value of the photographs was not outweighed by the danger of unfair prejudice.

After reviewing the photographs, the record in general, and Defendant's arguments, we cannot conclude that the trial court erred in allowing the collection of photographs to be introduced into evidence. The photographs were relevant to the issue of Defendant's appearance as compared to that of the perpetrator. Defendant has failed to show how the relevance of the photographs were substantially outweighed by the danger of unfair prejudice. Further, Defendant has failed to demonstrate that the trial court abused its discretion in permitting the photographs to be admitted. Accordingly, this court cannot reverse the trial court on this issue. *See Banks,* 564 S.W.2d at 949.

### 32. Questioning of witness Robert Bolin

Robert Bolin, whose father lived in the same boarding house as Defendant, testified that in January 1997, Defendant asked him to obtain a .25 automatic handgun. Defendant advised that he wanted the handgun for his personal protection. Bolin explained that he was a truck driver and met Defendant through his father. Mr. Bolin sold Defendant two .25 automatic handguns during January 1997. The first handgun was a Davis .25 automatic, which Bolin described as nickel-plated with black handle grips. After selling Defen-

dant the first handgun, Bolin testified that Defendant requested another handgun. The second handgun was also a .25 automatic, which was nickel-plated with pink handles. Further, Mr. Bolin testified that he gave Defendant a box of ammunition that came in a green and yellow box, but he could not recall the brand of the ammunition.

During the cross-examination of witness Robert Bolin, the defense asked Bolin if there had been extensive media coverage of the McDonald's murders in Nashville. Bolin responded that he assumed there had been, but because he drove a truck, he was not in Nashville a lot. The defense then sought to ask Mr. Bolin if he had ever seen the composite sketch of the perpetrator and if so, if he believed the sketch resembled Defendant. The trial court instructed the defense not to ask the question because counsel did not know the response to the question, and it was possible that his response might include a reference to one of the Defendant's other trials, which would cause a mistrial. The trial court concluded that any probative value of the response was "greatly outweighed by the possibility that Bolin would cause a mistrial by mentioning the unrelated murders." Defendant submits that the trial court should have allowed a jury-out hearing on the issue, but he did not make such a request at trial.

The trial court ruled pre-trial that no mention of Defendant's previous cases could be referenced at this trial. Accordingly, the court appears to have had concerns that the questioning regarding the media's extensive coverage of the McDonald's murders could lead into the witness's discussion of the media coverage in the Captain D's and Baskin Robbins's murders. The trial court ultimately concluded that the questioning was excluded by Rule of Evidence 403. Rule of Evidence 403 excludes evidence if the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Defendant did not request a jury-out hearing to make an offer of proof on this issue; therefore, the answer to defense counsel's question of whether Bolin had seen the sketch remains a mystery. Further, counsel expressed interest in knowing whether Bolin believed the sketch looked like Defendant. Again, however, no offer of proof was made; therefore, the question remains unanswered. In the absence of an offer of proof on this issue, Defendant cannot show that he was prejudiced by the trial court's ruling. Accordingly, we conclude that any error by the trial court on this issue was harmless. *See* Tenn. R.Crim. P. 52(a). Defendant is not entitled to relief on this issue.

### 33. Testimony of Bernie Billingsley

Bernie Billingsley testified that he became acquainted with Defendant in early 1997, while working out at Hermitage Fitness Center. He testified that in March 1997, after Defendant overheard him talking with other members of the fitness club about the stock market, Defendant approached him for financial advice. Defendant advised that he had $3,000 he wanted to invest and asked Mr. Billingsley's advice on how he should invest the money. Mr. Billingsley advised that he should invest the money in a mutual fund. When he saw Defendant a few weeks later, Defendant advised that he had invested the money in a mutual fund.

Defendant contends that the trial court erred in permitting Billingsley's testimony because it impermissibly reflects upon De-

fendant's financial condition. We have previously concluded that the trial court did not err in permitting the limited proof of Defendant's financial condition. We further hold that the trial court did not err in permitting the testimony of Mr. Billingsley, as it was relevant to show that although Defendant had been unemployed since February, he had either acquired or intended to acquire $3,000 and was seeking advice on how to invest the money. The relevance of this testimony was not outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403.

Defendant is not entitled to relief on this issue.

### 34. Trial court's refusal to instruct jury that it could convict defendant of premeditated murder or felony murder, but not both

Defendant contends that the trial court should have instructed the jury it could convict him of premeditated murder or felony murder, but not both. Defendant concedes, however, that the Supreme Court rejected this argument in *State v. Cribbs*, 967 S.W.2d 773, 787–88 (Tenn. 1998). Therefore, Defendant asserts this issue strictly for the purpose of preserving it for further review. Accordingly, Defendant is not entitled to relief on this issue.

### 35. Instruction to jury that punishment for the crime of first degree murder would be considered at separate sentencing hearing if Defendant was found guilty

Defendant contends that a portion of the court's instructions to the jury should have been deleted. Specifically, Defendant asserts that the jury should not have been instructed during the guilt-innocence phase of the trial that a separate sentencing hearing would be held if the jury found Defendant guilty of first degree murder. The trial court instructed the jury pursuant to Tennessee Pattern Jury Instruction 7.01(b) and 7.03(b) as follows:

> If you so find, then it shall be your duty after a separate sentencing hearing to determine whether the defendant will be sentenced to death, life imprisonment without the possibility of parole, or life in prison, but you will not consider punishment for this offense at this time.

Defendant argues that the above-quoted portion of the jury charge was improper despite the fact that it was technically accurate, because the instruction had the possibility of diverting the jury's attention from their sole task during that proceeding, which was to determine Defendant's guilt or innocence. However, this court has held that a trial court's failure to instruct the jury as to its role in punishing the defendant in a separate sentencing hearing if they found Defendant guilty of first degree murder necessitated a new trial. *State v. Fuino*, 608 S.W.2d 892, 895 (Tenn.Crim.App.1980). In *Fuino* this court specifically ordered the trial court to instruct the jury as to their duty to fix punishment after a separate sentencing hearing in the event of a verdict of first degree murder on remand. *Id.* at 896. Accordingly, the trial court did not err in giving the contested instruction. Defendant is not entitled to relief on this issue.

### 36. Use of styrofoam heads by Dr. Levy as demonstrative evidence

During Dr. Bruce Levy's testimony, he used styrofoam heads to demonstrate, with a pen, the head wounds suffered by the victims. Defendant objected to the use of the demonstrative evidence, contending that the heads were unduly prejudicial. Defendant made this argument in the appeal of his Montgomery County convictions, and this court rejected

his challenge. The Supreme Court has affirmed our conclusion that the use of styrofoam heads by the medical examiner was not error. *Reid,* 164 S.W.3d at 344. In rejecting Defendant's argument this court stated, and our Supreme Court has agreed with the following:

> This court approved the use of this type of demonstrative evidence in *State v. Robert E. Cole,* No. 02C01–9207–CR–00165, 1993 WL 539185, *3 (Tenn.Crim. App., Jackson, Dec. 30, 1993). In *Cole,* this court concluded that the evidence was "highly probative as to the issues to be decided by the jury. Under the circumstances, the trial court did not err in admitting the challenged evidence." *Id.* (citing *State v. King,* 718 S.W.2d 241 (Tenn.1986); *State v. Sexton,* 724 S.W.2d 371 (Tenn.Crim.App.1986)).
>
> This court cannot find that the use of the styrofoam heads was inappropriate in this case as the appellant urges. The trial court did not err in its ruling that the use of the styrofoam heads would assist [the medical examiner] in demonstrating the location of the wounds. This issue is without merit.

*Reid,* 164 S.W.3d at 344.

The trial court in this case specifically found that the styrofoam heads would assist Dr. Levy in demonstrating the location of the victims' wounds. This court cannot determine that the trial court erred in allowing the use of the demonstrative evidence. Defendant is not entitled to relief on this issue.

**37. Recall of witness Robert Bolin by the State**

█ The trial court allowed the State to recall witness Robert Bolin to correct his earlier testimony. Mr. Bolin had testified at trial that he sold Defendant a Larsen .25 automatic handgun. After his tes-

timony, the witness reviewed an earlier police report and realized that he had misstated the brand of the handgun during his testimony at trial. The defense objected to the recall of witness Bolin. However, the trial court allowed the recall of Mr. Bolin for the limited purpose of clarifying his misstatement as to the brand of the handgun. The court allowed the recall because Mr. Bolin was correcting his testimony as to the brand of the gun, but was not adding to his testimony. On recall, Mr. Bolin testified that the handgun he sold to Defendant was not a Larsen handgun, but was a Raven handgun.

Defendant contends that the trial court's action in permitting the recall of Mr. Bolin had the effect of allowing him to be a more credible witness than he actually was. Moreover, Defendant contends that the recall of Mr. Bolin must be compared to his request to recall Dr. Caruso at the competency hearing. However, the recall of witness Bolin differed greatly from the requested recall of Dr. Caruso. First, Mr. Bolin was a lay witness who made a misstatement on the stand. Dr. Caruso was an expert who had been compensated for his opinions and had provided his opinions in a written report. Second, Mr. Bolin merely needed to correct his testimony on the stand as to the brand of handgun he sold to Defendant. Dr. Caruso, however, would have been required to amend his expert report and alter the basis of his expert opinions. Furthermore, the trial court found that the circumstances surrounding the requested recall of Dr. Caruso were suspicious and lacking in credibility. No such finding was made as to witness Bolin.

█ The trial court has discretion in determining whether it will allow a party to recall a witness, and it does not constitute error absent an abuse of discretion. *State v. Caughron,* 855 S.W.2d 526, 539

(Tenn.1993); *Lillard v. State,* 528 S.W.2d 207, 212 (Tenn.Crim.App.1975). We cannot conclude that the trial court abused its discretion in allowing the State to recall Robert Bolin. Defendant is not entitled to relief on this issue.

### 38. Constitutionality of Tenn.Code Ann. Sec. 39–13–204

Defendant asserts that Tennessee Code Annotated Section 39–13–204 is unconstitutional. He asserts multiple challenges to the death penalty statutes, but acknowledges that the constitutional challenges he asserts have been decided adversely to him by the Supreme Court. He raises this issue merely to preserve it for later review.

The death penalty statutes have repeatedly been held constitutional. *See e.g., State v. Reid,* 91 S.W.3d 247, 313 (Tenn. 2002); *State v. Keen,* 31 S.W.3d 196, 233 (Tenn.2000), *cert. denied,* 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); *State v. Nesbit,* 978 S.W.2d 872, 902 (Tenn.1998), *cert. denied,* 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999); *State v. Vann,* 976 S.W.2d 93, 117 (Tenn.1998), *cert. denied,* 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); *State v. Bland,* 958 S.W.2d 651, 663 (Tenn.1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998); *State v. Cazes,* 875 S.W.2d 253 (Tenn.1994); *State v. Bigbee,* 885 S.W.2d 797, 813–14 (Tenn.1994); *State v. Smith,* 857 S.W.2d 1, 21–22 (Tenn.), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); *State v. Bane,* 853 S.W.2d 483, 488 (Tenn.1993); *State v. Harris,* 839 S.W.2d 54 (Tenn.1992).

Accordingly, Defendant is not entitled to relief on this issue.

### 39. Admission of victim impact evidence

 Defendant next contends that the trial court erred in denying his motion to exclude all victim impact evidence. Specifically, defendant argues that *State v. Nesbit,* 978 S.W.2d 872 (Tenn.1998), the case allowing victim impact testimony, had not been decided at the time of the crimes at issue; therefore, allowing victim impact testimony in this case would constitute a violation of Defendant's right to be free from ex post facto laws. Defendant acknowledges that the Supreme Court rejected this precise issue against him in *State v. Reid,* 91 S.W.3d 247 (Tenn.2002), but asserts it for the purpose of preserving it for later review. Defendant is not entitled to relief on this issue.

### 40. [Deleted: Use of "mass murder" aggravating circumstance when defendant had not been convicted of other murders at the time of the commission of the crimes in this case]

### 41. [Deleted: Admission of evidence of the Captain D's murders to establish the "mass murder" aggravating circumstance]

### 42. "Avoiding Arrest" aggravating circumstance

 Defendant moved in a pretrial motion to strike aggravating circumstance (i)(6), the "avoiding arrest" aggravator, because it duplicates the elements of the underlying offense and therefore fails to narrow the class of death-eligible offenders in violation of the state and federal constitutions and it duplicates the elements of the (i)(7) aggravator and therefore fails to narrow the class of death-eligible offenders. The trial court denied Defendant's motion. On appeal, Defendant argues that the trial court erred in denying the motion.

However, Defendant acknowledges that the Supreme Court has rejected his arguments. *See State v. Bush,* 942 S.W.2d 489, 504 (Tenn.1997) where the Supreme Court approved the use of the (i)(6) aggravator when an offense in addition to a murder occurred and *State v. Blanton,* 975 S.W.2d 269, 280 (Tenn.1998) where the Supreme Court approved the use of the (i)(6) and (i)(7) aggravators in the same case. Despite the Supreme Court's rejection of Defendant's arguments, he makes them in this appeal for the purpose of preserving the issue for further review. Defendant is not entitled to relief on this issue.

### 43. Life photographs of victims

Defendant challenges the introduction of photographs taken of the victims before they were murdered. Defendant asserts that the photographs, introduced during the victim impact testimony, served only to inflame the jurors and appeal to their emotions. The State counters that the photographs were probative of the issue of the impact of the death on the victims' family members and to show those unique characteristics which provide a brief glimpse into the life of the victims. The Supreme Court has held:

> [g]enerally, victim impact evidence should be limited to information to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

*Nesbit,* 978 S.W.2d at 887. In this case, the photographs were introduced to provide a brief glimpse into the lives of the victims, as allowed by *Nesbit.* According-

ly, the court did not err in allowing the introduction of these photographs. Defendant is not entitled to relief on this issue.

### 44. Victim impact testimony by family members

During the penalty phase, Ivette Rivera, wife of Ronald Santiago, testified as to the effect her husband's death had on her life and the lives of her children. In so doing, she discussed the last time she and her children had seen Mr. Santiago. She also testified that her daughter will not allow anyone to call her "princess" because that is the nickname Mr. Santiago had for his daughter. Doyle Brown, Andrea Brown's father, testified as to the difficulties he and his family were having in dealing with his daughter's death. In his testimony he advised that his daughter's room remained exactly the same, and they had kept the car that Andrea bought just before she was killed. He further stated: "It's been real hard to learn that she won't be here anymore." Defendant maintains that these passages of testimony exceed the permissible scope of victim impact evidence.

Defendant did not object to the testimony by either Ivette Rivera or Doyle Brown; therefore, this issue is waived. *See State v. Thornton,* 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn. R.App. P. 36(a)); *State v. Green,* 947 S.W.2d at 188. Further, we find that the testimony by Ms. Rivera and Mr. Brown was proper victim impact testimony under *Nesbit,* 978 S.W.2d at 879. Accordingly, Defendant is not entitled to relief on this issue.

### 45. Non-statutory mitigating circumstances

Defendant requested that the trial court instruct the jury as to twenty-four specific non-statutory mitigating circumstances. Defendant asked that the non-statutory mitigators be charged verbatim.

The trial court denied Defendant's request. Instead, the court instructed the jury on eleven general categories of mitigating circumstances. Defendant contends that the trial court erred in charging the general non-statutory mitigators, but admits that the trial court's instruction complied with current case law.

The Supreme Court affirmed the trial court's denial of a similar request made by Defendant in his appeal of his convictions of the Captain D's murders. In that case, Defendant requested that the trial court instruct the jury as to twenty-eight specific non-statutory mitigating circumstances. *Reid*, 91 S.W.3d at 305. In affirming the trial court's denial of Defendant's request for the twenty-eight non-statutory mitigators, the Supreme Court relied on *State v. Odom*, 928 S.W.2d 18, 31 (Tenn.1996), where the court had held that instructions on non-statutory mitigating circumstances must not be fact specific and thereby imply to the jury that the court had made a finding of fact in contravention of Article VI, Section 9 of the Tennessee Constitution. The *Reid* Court determined that the trial court had not erred in providing instructions to the jury, as it had provided non-statutory mitigating circumstances drafted in general categories, which were drafted in a similar style to the statutory mitigating circumstances and were substantially the same as the instructions requested by Defendant. *Reid*, 91 S.W.3d at 307.

In this case, the trial court complied with Tennessee case law in charging the jury with the eleven general non-statutory mitigating circumstances. The mitigating circumstances were drafted in a style similar to the statutory circumstances, they embodied the requests made by Defendant, and they reflected the proof presented during the sentencing hearing. Accord-

ingly, the trial court did not err in this regard. Defendant is not entitled to relief on this issue.

### 46. Jury instruction on victim impact testimony

As previously set forth, Defendant filed a motion to exclude all victim impact evidence. Defendant also challenged the victim impact jury instruction in *State v. Nesbit*, 978 S.W.2d 872, 892 (Tenn.1998). The instruction reads as follows:

> You may consider the victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

Defendant contends that the *Nesbit* instruction is illogical and that victim impact evidence is irrelevant under the death penalty statute. However, victim impact evidence has been declared constitutional by the United States Supreme Court and the Tennessee Supreme Court. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Nesbit*, 978 S.W.2d 872, 889 (Tenn.1998), *cert. denied*, 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999). Furthermore, the argument advanced by defendant that victim impact testimony is irrelevant and should be excluded under Tennessee's current capital sentencing system, has been rejected by the Supreme Court. *See State v. Reid*, 91 S.W.3d at 282–83, holding that any contradiction between the statute and the *Nesbit* instruction inures to the benefit of Defendant; therefore, this argument does not entitle Defendant to relief.

47. [Deleted: Sufficiency of evidence to support jury's finding that aggravating circumstances outweighed mitigating factors beyond a reasonable doubt]

48. [Deleted: Proportionality Review]

[Deleted: CONCLUSION]

ADOLPHO A. BIRCH, JR., SP. J., concurring and dissenting.

I concur in the conclusion of the majority that Reid's convictions should be affirmed. As to the sentences of death, however, I respectfully dissent. I continue to adhere to my view, expressed many times before, that the comparative proportionality review protocol currently embraced by the majority is inadequate to shield defendants from the arbitrary and disproportionate imposition of the death penalty. *See State v. Reid,* 164 S.W.3d 286, 323–325 (Tenn.2005) (Birch, J., concurring and dissenting), and cases cited therein. Accordingly, I respectfully dissent from that portion of the majority opinion affirming the imposition of the death penalty in this case.

Aside from the above, I would urge the Executive to follow the lead of California and Florida, whose Governors have suspended executions by lethal chemical until in-depth investigations can be conducted into the propriety of using a certain chemical as a killing agent. I am led to believe that Tennessee includes the same lethal chemical(s) in its protocol as do California and Florida.